Kyle H. LITTLE, Julie Anna Perez, John Rivera, Marta Hogan, Gilbert Muro, Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY, INC., Defendant.

Nos. 00 Civ. 3609(SAS), 00 Civ. 3612(SAS), 00 Civ. 3616(SAS), 00 Civ. 5771(SAS), 00 Civ. 5774(SAS).

United States District Court, S.D. New York.

April 22, 2002.

---

---

David Ratner, Martha McBrayer, Benedict P. Morelli & Assoc., P.C., New York City, for plaintiffs.

Christopher P. Reynolds., Brian D. Buckstein, Morgan, Lewis & Bockius, LLP, Daniel M. Kummer, Senior Litigation Counsel, National Broadcasting Company, Inc., New York City, for defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs have filed five individual complaints against their employer, the National Broadcasting Company, Inc. ("NBC"), alleging numerous acts of racial and sexual discrimination throughout their fifteen to twenty-year careers at the company.[1] These cases were consolidated for purposes of pretrial proceedings, and NBC now moves pursuant to Rule 56(c) of the Federal Rules of Civil Procedure for summary judgment against all plaintiffs. NBC characterizes plaintiffs as "disgruntled employees" who threaten to "exploi[t] and dilut[e]" the discrimination statutes. *See* Omnibus Memorandum of Law in Support of Defendant NBC's Motions for Summary Judgment ("Def. Omnibus Mem.") at 24 (quoting *Campbell v. Alliance Nat'l, Inc.,* 107 F.Supp.2d 234, 251 (S.D.N.Y.2000)). I disagree. Although

some of plaintiffs' claims must be dismissed on procedural grounds or for lack of proof, there is sufficient evidence in each of these cases to present triable issues that must be decided by a jury. It is the province of the jury, rather than the Court, to define the limits of appropriate conduct in the workplace. *See Gallagher v. Delaney,* 139 F.3d 338, 342–43 (2d Cir. 1998). But the plaintiffs' evidence, *if true,* does tend to suggest that "something is rotten in the [offices of NBC]." William Shakespeare, *Hamlet, Prince of Denmark,* Act I, Scene IV.

## I. BACKGROUND

### A. The Parties

NBC is a diversified media company that produces and distributes various forms of entertainment, news and sports programming via broadcast television, cable television, the Internet and other distribution channels. *See* Def. Omnibus Mem. at 3. At its facility in Rockefeller Center in New York City, NBC produces and facilitates the production of a variety of television shows. *See id.;* Affidavit of Mary Beth Scalici, NBC's Director of Centralized Scheduling and Production Services ("Scalici Aff.") ¶ 2. These shows are staffed with either NBC employees, freelance personnel or other employees who are hired on a per diem basis without any job security ("Daily Hires"). *See id.* ¶ 5.

Plaintiffs are all current employees of NBC who have been employed there for the last fifteen to twenty years. *See* Deposition of John Rivera ("Rivera Dep.") at 16–17, 249; Deposition of Marta Hogan ("Hogan Dep.") at 42; Deposition of Kyle H. Little ("Little Dep.") at 53, 311–12;

---

1. Plaintiffs initially named numerous current and former NBC employees as individual defendants. A Stipulated Order dismissing the individual defendants was entered on April 30, 2001. *See* 4/20/01 Order. Another Stipulated Order dismissing plaintiffs' common law claims was entered on August 22, 2001. *See* 8/22/01 Order.

Deposition of Gilbert Muro ("Muro Dep.") at 32; Deposition of Julie Anna Perez ("Perez Dep.") at 682–83. Since they were hired, plaintiffs have, all been covered by a Collective Bargaining Agreement (the "CBA") negotiated by their union, the National Association of Broadcast Employees and Technicians ("NABET"). *See* Scalici Aff. ¶ 7; Ex. MM to Affidavit of Christopher P. Reynolds, attorney for NBC ("Reynolds Aff."); Rivera Dep. at 249; Hogan Dep. at 42. This agreement provides a wage scale by job classification, with Group 1 having the lowest wage scale and Group 8 having the highest.[2] *See* Scalici Aff. ¶ 8. The CBA also provides a mechanism by which employees may receive the salary of a higher wage group on a temporary basis. "Daily Upgrades" are given when an employee temporarily performs the specific duties of a higher wage group. *See id.* ¶ 10. "Merit Upgrades" are given when an employee exhibits leadership and has a record of good punctuality, good attendance and a willingness and ability to take on more responsibilities than required of his or her job classification. *See id.* ¶ 11. Under the CBA, NBC has the discretion and authority to determine work assignments and job classifications. *See id.* ¶ 9.

## B. NBC's Complaint Mechanism and Diversity Training Programs

NBC's complaint procedure for harassment claims is contained in its anti-harassment policy, which is distributed annually to all employees and posted throughout the Rockefeller Center facility. *See* Exs. L–O to Reynolds Aff.; Rivera Dep. at 405–16; Muro Dep. at 574; Little Dep. at 306. Pursuant to this procedure, employees are expected to report any "unwelcome offen-

sive" conduct to either: (1) the employee's "line management," (2) Tony Loney, NBC's Director of Diversity, (3) NBC's Ombudsperson, or (4) a representative assigned to that particular employee. Ex. L to Reynolds Aff. at 1–2. Any supervisor or manager who becomes aware of "any complaint or concern of conduct that might potentially violate [the] policy" is obligated to report that complaint or conduct to any one of the four individuals described above or to NBC's law department. *Id.* at 2. Furthermore, the policy states that "NBC will take prompt corrective action that is calculated to stop the offensive behavior," that NBC will discipline the offending person "where appropriate," and that NBC "strictly prohibit[s] retaliation or reprisal against an individual who reports or opposes harassment." *Id.* Plaintiffs do not contest the fact that this policy exists, that they have seen the policy, and that they have attended diversity seminars at NBC. *See* Rivera Dep. at 405–16; Muro Dep. at 572–75; Little Dep. at 306; Perez Dep. at 449–50; Hogan Dep. at 326.

## C. Plaintiff–Specific Facts

### 1. Muro

Gilbert Muro is a Mexican–American. *See* NBC's Rule 56.1 Statement of Undisputed Facts ("Def.'s Muro 56.1") ¶ 1; Plaintiff Muro's Response to Rule 56.1 Statement ("Muro 56.1") ¶ 1. In 1986, he was introduced to Frank Accarrino, who was then a manager at NBC, through Accarrino's wife, with whom Muro had a friendship. *See* Def.'s Muro 56.1 ¶ 1; Muro 56.1 ¶ 1. While Muro's employment application indicates that he was referred to NBC by Accarrino, *see* Def.'s Muro 56.1 ¶ 3; Muro 56.1 ¶ 3, he was not officially hired by Accarrino, *see* Muro 56.1 ¶ 3;

---

**2.** "Daily Hires" are covered by a separate collective bargaining agreement. *See* Scalici Aff. ¶ 5. The agreement sets a floor for their compensation, which is otherwise based on a variety of factors, including skill level and labor market demand. *See id.*

Deposition of Frank Accarrino, Vice President of NBC's News, Entertainment and Facility Operations ("Accarrino Dep.") at 213. Throughout his career at NBC, all of Muro's supervisors have reported to Accarrino. *See* Accarrino Dep. at 307, 309.

When Muro first began work at NBC in March 1986, he served as a Group 2 Videotape Engineer. *See id.* ¶ 4. Shortly thereafter, he was upgraded to a Group 3 Videotape Engineer. *See* Def.'s Muro 56.1 ¶ 5; Muro 56.1 ¶¶ 4, 5. Later in 1986, Muro was upgraded to a Group 7 Technical Director ("TD") and assigned to NBC's morning show "Today".[3] *See* Def.'s Muro 56.1 ¶ 6.

### a. Muro's Experience on "Today"

Muro was the TD on "Today" for ten to eleven years, during which he was upgraded to Group 8. *See* Def.'s Muro 56.1 ¶¶ 8, 9 (approximately ten years); Def. Resp. to Pl. 56.1 ¶¶ 8, 9 (eleven years). As the TD, Muro was responsible for operating the show's electronic switching equipment (generating the show's graphics and visual effects), overseeing the technical aspects of the show and managing the production activities of the subordinate engineers on the crew. *See* Def.'s Muro 56.1 ¶ 7; Muro 56.1 ¶ 7 (listing some additional responsibilities). Muro contends that on a number of occasions in 1988 and 1989, George Paul, the director of "Today" and Muro's immediate supervisor, made disparaging, racist and sexist remarks in his presence.[4] Paul made a comment about an Hispanic co-worker's accent, commenting: "I don't understand a damn thing he's saying," and complaining, "it's ridiculous we can't speak English around here." Muro Dep. at 66, 68. Paul also told Muro he thought this co-worker was "lazy" and "stupid because

of his accent." *Id.* at 67. Paul also made disparaging comments about African–American guests on the show, using racial slurs and mocking them with "a black dialect." *Id.* at 74, 88–89. Once Muro heard Paul refer to the African–American host of the show as "that black prick." *Id.* at 88. According to Muro, Paul "used the 'C' word for women," used the word "spic" at least two times, and joked about an Asian audio engineer in front of the entire Control Room, asking him about "laundry." *Id.* at 67, 69–71.

Muro asserts that he twice complained to Paul in 1989, informing him that, as a Mexican–American, he was offended by Paul's language and comments. *See id.* at 71–72, 75–77. Paul cursed at Muro in response and, on one of these occasions, threatened to remove him as TD on "Today"'s upcoming five-city tour. *See id.* at 71–72, 75, 84. That same year, Muro twice complained about Paul's conduct to Accarrino who, as manager of the technical supervisors at NBC, was ultimately responsible for promotions, raises, show assignments, scheduling and careers. *See id.* at 69, 76, 79, 81, 84, 391. Muro allegedly asked Accarino "how anyone in [Paul's] position who has all these prejudices could be responsible for promoting people. How could anyone get a fair shake with this man sitting at the helm." *Id.* at 73. Accarrino responded to these complaints by commencing a routine mocking of Muro's surname, pronouncing it "with a phony Spanish accent" whenever he saw Muro at NBC. *Id.* at 95–97, 102. This "needling . . . mocking . . . harrassing" Spanish accent allegedly continued until 1998, when Muro filed his complaint with the EEOC. *Id.* at 102, 104.

---

**3.** According to Muro, he accepted the job at NBC based on NBC's representation that he would work as a Group 7 TD. *See* Muro 56.1 ¶¶ 4, 6.

**4.** Paul no longer works for NBC. *See* Accarrino Dep. at 219.

On June 20, 1997, Muro attended a meeting called by NBC to discuss the removal of Collette Baptiste, an African–American woman who worked on "Today", from her position as a TD (the "Baptiste Meeting"). *See* Def.'s Muro 65.1 ¶ 13; Muro 56.1 ¶ 13. Muro claims that, prior to the hearing, he overheard the Technical Manager on the Today show, Joseph McCourt, call Baptiste "that black bitch" while yelling to the executive producer of the show. Muro 56.1 ¶¶ 10, 14. He claims that Baptiste invited him to attend the meeting after he helped her utilize and navigate NBC's complaint procedures and that NABET encouraged him to attend. *See* Muro 56.1 ¶ 14; Muro Dep. at 394. Also in attendance at the meeting was McCourt, who allegedly recommended Baptiste's removal from the show, *see* Muro Dep. at 438, as well as John Fritsche, the Senior Production Manager on "Today".[5] At the meeting, Muro defended Baptiste, stating that NBC should put itself in Baptiste's shoes because she is a black female and has no support system. *See* Def.'s Muro 56.1 ¶ 14; Muro. Dep. at 459–60. According to Muro, Fritsche's response was to "jump out of his chair as if to attack [Muro] and sa[y] he was going to come over there." Ex. T to Reynolds Aff. ("Muro Supp. Charge") ¶ 3. Another attendee, Mark Zulli, purportedly "grabbed and restrained him." *Id.*

Two weeks after the Baptiste meeting, Muro was removed from "Today" and reassigned to "The Late Show With Conan O'Brian" ("Conan"). *See* Def.'s Muro 56.1 ¶ 15; Muro 56.1 ¶ 15. He was replaced by a Caucasian man. *See* Muro 56.1 ¶ 10; Accarino Dep. at 236–37. According to NBC, the "Today" show had begun looking for a replacement for Muro and a compa-

rable assignment for him at least a year earlier and the final decision to reassign Muro was made several weeks before the Baptiste Meeting. *See* Def.'s Muro 56.1 ¶¶ 10, 11. Muro contends that NBC's decision to remove him from "Today" and reassign him to "Conan" was retaliation for his involvement in the Baptiste Meeting. *See* Muro 56.1 ¶ 10; Muro. Dep. at 109. He claims that, prior to his removal from "Today", no one had ever expressed any concerns to him about his performance, reliability or attitude. *See* Affidavit of Gilbert Muro ("Muro Aff."), attached to Affidavit of Martha McBrayer, attorney for plaintiffs ("McBrayer Aff."), ¶ 3. His one formal evaluation, which he received in 1991, was purportedly "excellent". *Id.; see also* Annual Performance Review—Represented Employees, Ex. V to McBrayer Aff. No one at NBC explained the reason for his removal. *See* Muro 56.1 ¶¶ 10, 11; Muro Dep. at 433–34.

### b. Muro's Experience on "Conan"

On "Conan," Muro worked as a Group 8 TD and was supervised by Alina Chaban, the show's Technical Manager who is Hispanic. *See* Def.'s Muro 56.1 ¶ 15; Muro Aff. ¶ 6. Even though Muro remained at the same official pay scale, he claims that his compensation decreased dramatically because "Conan" entailed fewer hours than "Today," less overtime, and differential pay for overnight work. *See* Muro 56.1 ¶ 15; Muro Dep. at 63–64. He also claims that "Today" required more travel, which provided built-in overtime as well as an expense budget. *See* Muro 56.1 ¶ 15; Muro Dep. at 63–64, 113, 638, 640.

Muro contends that the director of "Conan," Elizabeth Plonka, routinely flirted with the Caucasian men on the crew of the

---

**5.** Fritsche is currently the Vice President of Olympic Operations at NBC. *See* Affidavit of John Fritsche ¶ 1.m

show. *See* Muro Dep. at 135, 138–39. He claims that many of the Caucasian crew members massaged her back, "would hug her, would sit on her lap, would . . . have very intimate contact with her in the control room . . . . She would walk up to young, white, male caucasians—put her arm around them, whisper in their ear." *Id.* at 139; *see also id.* at 146–48, 159, 164, 185, 188, 196, 205. Plonka made comments to the male crew members about their clothing, hair and physique, and used vulgar language to describe men on the show. *See id.* at 149, 212–13. Muro claims that, unlike the other male crew members who responded to her flirting, he "did not want to get involved with her" and made an effort to keep her "at arm's length." *Id.* at 148–49; *see also id.* at 152–53 (Muro refused Plonka's request for a back massage); *id.* at 154 (Muro moved away when Plonka put her arm around him). He did not, however, complain to Plonka or to anyone else until he was removed from the show. *See id.* at 153–55.

Muro contends that "favoritism would be given" to Caucasian males who flirted with Plonka and "liked to play her game." *Id.* at 144; *see also id.* at 193, 212. For example, he claims that Camera Operator Jack Gagney, who acted "flirtatious" with Plonka, received "preferential treatment" because he had a dual assignment on "Conan" and The Rosie O'Donnell Show ("Rosie") and therefore got paid for "long days." *Id.* at 167–170. He also claims that preferential treatment was given to Camera Operator Ken Decker who routinely gave Plonka back massages, often spoke to Plonka with his face close to hers, and twice took Plonka on his boat. *See id.* at 188, 190, 196. According to Muro, Plonka hired Ken's brother over Muro's candidate, a more experienced African–American woman. *See id.* at 188–191. Another example provided by Muro is Audio Mixer Fred Zeller, who frequently gave Plonka back rubs, spoke with his face close to hers, and whispered in her ear. *See id.* at 205. Accordingly, Plonka was more lenient with Zeller than she was with Muro, never reprimanding Zeller for arriving late but chastising Muro for being even a minute late from a bathroom break. *See id.* at 202–05.

Muro alleges that Chaban "supported" Plonka's actions. *Id.* at 423. When Muro complained to Chaban that Plonka was allowing Caucasian male crew members to drift in and out of the studio without repercussion, Chaban took offense at Muro's questioning of her authority. *See id.* at 422. She later told Accarino that Muro was being "irresponsible" because his job was to facilitate Chaban's relationship with the crew. *Id.* at 424.

Muro also complains of harsh treatment by Accarrino during this time. After he asked the scheduling office some questions about his co-worker Julie Perez's pay stubs, he was called into Accarrino's office. *See id.* at 402–04. In that meeting, Accarrino allegedly told Muro that if he "did not conform to the rule[s]" and was "not obedient to these rules" he "would be immediately removed from that show and put on a nonassignment or to languish the rest of [his] career in the lounge." *Id.*

At Plonka's request, Muro was removed from "Conan" on June 19, 1998. *See* Def.'s Muro 56.1 ¶ 21; Muro 56.1 ¶ 21. Muro contends that Plonka requested his removal in retaliation for his refusal to comply with her sexual advances.[6] *See* Muro 56.1 ¶ 22. He says that, in a meeting held on June 19, Plonka gave the following reasons

---

6. Muro contends that Plonka had filled all crew positions with Caucasian men, with the exception of himself and Julie Perez. *See* Muro Dep. at 218–19.

for requesting his removal: "I never have your undivided attention ... The writers and producers are unwilling to submit requests for complicated effects because of your limited abilities and you are unable to fill the shoes of Jim Marshall, the former Technical Director." 6/24/98 Memo from Gilbert Muro to NABET Local 11 ("Muro NABET Complaint"), Ex. U to McBrayer Aff., at 2. She also told Muro that he "was always sticking [his] nose where it does not belong." *Id.* NBC claims that Plonka requested Muro's removal for performance reasons, about which he had been counseled on several occasions, and because of his inability to "establish a rhythm with [her] in the daily taping of the show." [7] Def.'s Muro 56.1 ¶¶ 17–22.

On June 24, 1998, Muro filed a complaint with the NBC Ombudsperson. *See* Muro Aff. ¶¶ 4, 5; Muro NABET Complaint. Muro complained of unfair treatment on the "Conan" show and unjustified removal from the show. *See* Muro NABET Complaint at 1–2. He also referred to removal from the "Today" show after his attendance at the 1997 Baptiste Meeting. *See id.* at 3. In 1998, Muro met twice with the Ombudsperson and was informed that NBC would be conducting an investigation into his allegations. *See* Def.'s Muro 56.1 ¶ 39; Muro 56.1 ¶ 39. However, Muro insists that the Ombudsperson did not properly handle his complaints. *See* Muro 56.1 ¶ 39. He claims that the Ombudsperson warned him that "she was there to defend NBC" and that her "responsibility [was] to

NBC." *Id.* He also claims that NBC has done nothing in response to his complaints. *See id.*

#### c. Muro's Experience on "Rosie"

Two or three weeks after his removal from "Conan", Muro was reassigned to work as a Group 8 TD on "Rosie", "a very high profile" and "extremely important" show. Def.'s Muro 56.1 ¶¶ 23–25; Muro 56.1 ¶¶ 23–25. Muro claims that Plonka spoke to the show's Director, Debbie Miller, and told her to "watch out" for Muro because he was incompetent. Muro Dep. at 410. He claims that, on his first day on the show, NBC's Scheduling Coordinator, Carmela Tripodi, was standing between him and Miller and was "glaring" at him. *Id.* at 415–16. Soon after he began working on "Rosie," Plaintiff was informed that Miller was unhappy with his performance.[8] *See* Def.'s Muro 56.1 ¶ 27; Muro 56.1 ¶ 26. Within a few days, Muro was removed from "Rosie." *See* Def.'s Muro 56.1 ¶¶ 26, 29; Muro 56.1 ¶ 26.

#### d. Muro's Assignments After His Removal From "Rosie"

Since his removal from "Rosie," Muro has continued to work as a Group 8 TD on a number of NBC shows. *See* Def.'s Muro 56.1 ¶ 29. According to Muro, he has been assigned to shows with some of the most undesirable shifts. In August 1998, he was assigned to "The Sunrise Show", which involved an overnight schedule from

---

7. NBC asserts that there were problems concerning Muro's tardiness, his use of the telephone for personal matters, and an incident regarding unauthorized absenteeism. *See* Def.'s Muro 56.1 ¶¶ 16–19. Muro denies these claims and offers a very different version of the relevant events. *See* Muro 56.1 ¶¶ 16–19.

8. NBC contends that Miller informed Muro that she did not like his work on the electron-

ic switching equipment. *See* Def.'s Muro 56.1 ¶ 27. Muro admits that Miller mentioned that she did not like "some of the switching" he was doing, but claims that she also said that, although she "thought [he] was a nice guy," "she didn't feel comfortable with [him] working there." Muro 56.1 ¶ 27. Muro claims that Tom Popple, the Technical Manager on "Rosie", informed him that Miller was unhappy with his performance. *See id.* ¶ 26.

2:00 a.m. to 10:00 a.m. five nights a week. *See* Muro Dep. at 260–62. Since September 1998, he has worked an "erratic" and "undesirable" weekend overnight shift on "Weekend Today". *Id.* at 263–65, 418–19. Three days during the week he sits on standby or performs fill-in work. *See id.* at 266–67, 270.

On "Weekend Today", Muro was supervised by McCourt, who allegedly made derogatory remarks about Hispanics in Muro's presence. Muro contends that McCourt "always used this weird Hispanic accent when he talked to Hispanic people" and that, at a Spanish concert in 1999, McCourt commented "it's going to be greasy out there. There is going to be lots of beans and rice and chicken all over the street. Those people are very greasy." Muro Dep. at 439–40. Muro also alleges that McCourt "chose to make written records of the most insignificant errors made by [him] while ignoring major errors made by other operators." Muro Supp. Charge ¶ 14.

Although NBC claims that, as a Group 8 TD, Muro's pay has not declined, Muro insists that he has incurred substantial loss in income because he has been assigned to shows with much less overtime. *See* Def. Muro 56.1 ¶ 29; Muro 56.1 ¶ 29. Muro also contends that he is no longer assigned to the shows on which personnel are offered personal services contracts ("PSC's"), an arrangement that offers higher pay than the Group 8 pay scale. *See* Muro Dep. at 38, 646. He also contends that he continues to be denied opportunities, such as going to the Olympics. *See id.* at 61, 270.

### e. Muro's Formal Complaints and Surrounding Events

On August 21, 1998, Muro filed a charge with the New York State Division of Human Rights ("NYSDHR"). *See* Def.'s

Muro 56.1 ¶ 30; Muro 56.1 ¶ 30; Ex. T to Reynolds Aff. ("Muro Charge"). He filed a supplemental charge on March 3, 1999. *See* Def.'s Muro 56.1 ¶ 30; Muro 56.1 ¶ 30; Muro Supp. Charge. These charges allege that Muro was discriminated against because of his race and sex in the terms and conditions of his employment and that he was subject to retaliation. *See* Def.'s Muro 56.1 ¶¶ 31, 35; Muro 56.1 ¶¶ 31, 35. The Supplemental Charge also alleges that Plonka's behavior on "Conan" was "against the company's sexual harassment policy" and that it made Muro "uncomfortable." *See* Muro Supp. Charge ¶ 6; *see also* Muro 56.1 ¶ 31 (insisting that charges alleged that Muro was subject to a sexually hostile work environment while working at "Conan").

Around this time, Muro also formed the NABET diversity committee along with Perez, Rivera, and Little. *See* Muro Aff. ¶ 4; Perez Dep. at 75. The committee was allegedly an attempt to address "the harassment and discrimination issues that NABET members . . . were experiencing." Perez Dep. at 76. In 1999, Muro, Rivera, Perez and Little met with Tony Loney, NBC's Director of Diversity. *See* Muro Aff. ¶ 11. Muro explains that they "asked him to investigate why the Ombudsman's office was so ineffective in handling [their] complaints of discrimination, harassment and retaliation." *Id.* Although Loney promised to investigate, Muro contends that "nothing was done." *Id.* Furthermore, Loney allegedly responded that "if [they] were not good at [their] jobs, NBC would have already gotten rid of [them]." *Id.*

On August 3, 2000, Muro filed a Complaint with this Court. *See* Def.'s Muro 56.1 ¶ 32; Muro 56.1 ¶ 32; Complaint ("Muro Compl."), Ex. F to Reynold Aff. He filed an Amended Complaint on March 3, 2001. *See* Def.'s Muro 56.1 ¶ 32; Muro

56.1 ¶ 32; First Amended Complaint ("Muro·Am. Compl."), Ex. F to Reynolds Aff. The Amended Complaint includes the following claims for relief: (1) racial harassment, race discrimination and retaliation in violation of Title VII; (2) race discrimination and retaliation in violation of NYSHRL; (3) sexual harassment, sex discrimination and retaliation in violation of Title VII; (4) sexual harassment and retaliation in violation of NYSHRL. *See* Muro Am. Compl. ¶¶ 78, 82, 97, 101.

Muro alleges that, subsequent to his initiation of formal proceedings, there were two other racial incidents at NBC's Rockefeller Plaza facility.[9] On June 22, 2000, he saw Klu Klux Klan robes outside the door to the "Conan" control room. *See* Muro Aff. ¶ 6; *see also* Photograph of Robes, Ex. C to McBrayer Aff. On June 21, 2001, Little, Rivera and another African–American co-worker, Joseph Meyer, summoned Muro to the second floor video maintenance shop at NBC's Rockefeller Center facility to show him a noose with Meyer's name attached to the rope which was hanging on the wall across from Meyer's work station. *See* Muro Aff. ¶ 8; *see also* Photograph of Noose, Ex. D to McBrayer Aff. Although NBC Employer Relations Director Alexandra McCauley promised to launch an investigation, Muro is not aware of anything that has been done. *See* Muro Aff. ¶ 9.

### 2. Hogan

#### a. Hogan's Experience at NBC from 1983–95

Marta Hogan is a woman of Italian and Puerto Rican descent. *See* NBC's Rule 56.1 Statement of Undisputed Facts ("Def.'s Hogan 56.1")·¶ 1. She was hired by NBC in 1983, *see id.*, as a Senior Audio Engineer to work on local news broadcasts. *See* Plaintiff's Response to Rule 56.1 Statement ("Hogan 56.1") ¶ 2. In 1985, NBC assigned Hogan to its "Saturday Night Live" ("SNL") show where she worked as a Group 2 Audio Assistant. *See* Def.'s Hogan 56.1 ¶ 3. Her "SNL" supervisor was Keith Handyside. *See id.* Hogan remained on "SNL" for two seasons until she went out on strike during a labor dispute. *See id.* ¶ 4. When Hogan returned from the strike, she was replaced by NBC staff employee Bob Sazer, who had also been on strike. *See* Hogan 56.1 ¶ 4. Sazer, a Caucasian male with less studio audio engineering experience than Hogan, had been trained by Hogan as an Audio Assistant on "SNL". *See id.* Hogan never received a legitimate explanation for her removal from "SNL", nor was she ever informed of any performance or personality issues while on "SNL". *See id.*

Upon returning from the strike, Hogan was assigned to NBC's "News At Sunrise" show, *see* Def.'s Hogan 56.1 ¶ 5, where she worked as a Group 2 Senior Audio Mixer, *see* Hogan 56.1 ¶ 5. Then, in 1988, Hogan was reassigned to "The Donahue Show" ("Donahue") as a Group 2 Senior Audio Mixer. *See* Def.'s Hogan 56.1 ¶ 6; Hogan 56.1 ¶ 6. NBC claims that Technical Manager Jack Bennett removed Hogan from "Donahue" in 1990 because of Hogan's technical errors, lack of problem solving skills, and tardiness. *See* Def.'s Hogan 56.1 ¶ 8. Hogan disputes these reasons,

---

9. Muro's Complaint alleges that, in Spring 2000, he overheard Tom Brokaw, an anchorman at NBC, tell a joke that he found offensive. *See* Muro Am. Compl. ¶ 68. Specifically, he claims that Brokaw said to one of the executive producers: "Hey, I've got one for you. Picture this: what if Geraldo Rivera was commentator for a political debate between Al Sharpton and Hillary Clinton. What a fiasco!" *Id.* However, there is no reference to this event in Muro's Affidavit, his response to NBC's 56.1 Statement, or his Memorandum of Law.

citing the positive performance review she received from Bennett in 1989. *See* Hogan 56.1 ¶ 8. Hogan also claims that any purported technical difficulties were caused by mechanical equipment failure outside her control. *See id.* ¶ 10. Furthermore, Hogan states that "Donahue" Executive Producer Pat McMillan never had any problems with Hogan or her job performance. *See id.* ¶ 8. Hogan was replaced by NBC staff employee Fred Zeller, a Caucasian male who she had trained. *See id.* After filing a grievance, Hogan was informed by NBC that she would be reinstated to the "Donahue" show. *See id.* Hogan was not reinstated, however, at the request of Vice President Frank Accarino and NBC Manager Rick Post. *See id.*

After her removal from "Donahue," Hogan returned to "SNL" as a PA Audio Mixer. *See* Def.'s Hogan 56.1 ¶ 12. Hogan remained on "SNL" until 1992 and thereafter worked on various shows as an Audio Engineer. *See id.* ¶¶ 12–13. While a number of these shows complained about Hogan's performance, *see id.* ¶ 14, she feels that she was unfairly subjected to disciplinary warnings, *see* Hogan 56.1 ¶ 14. In September of 1992, NBC Scheduling Manager, Carmela Tripodi, issued a written warning about Hogan's performance. *See* Def.'s Hogan 56.1 ¶ 15. In January of 1994, NBC issued Hogan a final written warning. *See id.* ¶ 16. The final written warning documented numerous instances of Hogan's poor performance. *See id.* ¶ 17. Although Hogan admitted the accuracy of a number of the events outlined in the final warning, she denied the validity of a majority of those events. *See id.* ¶ 18; Def.'s Hogan 56.1 ¶ 18. The final warning concluded by placing Hogan on "Conan", a high profile assignment, in an effort to help her succeed. *See* Def.'s Hogan 56.1 ¶ 19.

### b. Hogan's Complaints About "Conan"

On March 24, 1995, Hogan, along with two co-workers, went to NBC's Ombudsperson, Patricia Langer, to complain about discrimination and mistreatment on the "Conan" set. *See id.* ¶ 23. Langer and her assistant subsequently met with Hogan and informed her that the NBC investigation did not reveal sex discrimination but that NBC management would engage in an "ongoing dialogue" with "Conan" management to "straighten out" some of the crew problems. *Id.* ¶ 25. Langer purportedly told Hogan that there was nothing more she could do. *See* Hogan 56.1 ¶ 25.

Hogan claims that, as a result of this complaint, she was retaliated against by Accarino who instructed Technical Manager Frank Garofalo to remove Hogan from the "Conan" show. *See id.* ¶ 24. She claims that Accarino, who admitted to keeping a special file on Hogan, wanted her fired from NBC altogether. *See id.* In addition, she insists that Garofalo retaliated against her by informing the entire "Conan" crew that she had filed a complaint with the NBC Ombudsperson. *See id.* On July 1996, after approximately two years on "Conan", Hogan was removed from the show. *See* Def.'s Hogan 56.1 ¶¶ 21–22.

### c. Hogan's Experience After "Conan"

In the Fall of 1996, Hogan was assigned to NBC's Brooklyn studios to work as an extra on "Another World." *See id.* ¶ 26; Hogan 56.1 ¶ 27. Hogan also worked as a Group 2 Sound Effects Engineer under the supervision of Mary Beth Scalici and Robert McKearnin. *See* Def.'s Hogan 56.1 ¶ 27. Shortly after being assigned to Brooklyn, Hogan received a "14.2 Notice" from Scalici regarding her performance

and tardiness. *See id.* ¶ 28. According to Hogan, similarly situated white male employees were not punished for tardiness. *See* Hogan 56.1 ¶ 29. Although Hogan testified that she enjoyed working for Scalici for "the most part," she complained about harassment from McKearnin who would report Hogan late while ignoring the lateness of Caucasian males. *See id.* ¶ 30. McKearnin also continually refused to award Hogan discretionary upgrades which were routinely awarded to white male crew members. *See id.* Hogan worked on "Another World" until May 1999, when the show was canceled. *See* Def.'s Hogan 56.1 ¶ 33.

Hogan then returned to Manhattan where she worked as a Group 2 Audio Engineer from May 1999 through September 1999. *See id.* ¶ 34. In September of 1999, Hogan was assigned to "The Later Today Show" ("Later Today") as an Audio Assistant. *See id.* ¶ 35.

While on "Later Today," Hogan performed the show's Audio Transmission function. *See id.* ¶ 40. She claims that, although she performed the highly skilled Audio Transmission function, she was not paid at the customary Group 7 level. *See* Hogan 56.1 ¶ 40. While Hogan's white male predecessor, Steve Singer, regularly received the Group 7 upgrade, NBC Technical Manager Tom Popple refused to give Hogan the same upgrade. *See id.* Hogan worked on "Later Today" until August 2000, when the show was cancelled. *See* Def.'s Hogan 56.1 ¶ 41.

Hogan currently works on "The Today Show" and "Weekend Today." *See id.* ¶ 42. On "Weekend Today," she is respon-

sible for Audio Transmission, usually a Group 7 position, for which she is paid as a Group 2 Audio Engineer. *See* Hogan 56.1 ¶ 42. On "The Today Show," Hogan works as a Group 2 Audio Assistant. *See id.* Despite receiving upgrades to Group 5 or 7 for approximately half of the time, Hogan complains that two white male Audio Assists (Group 2 positions) are consistently awarded merit upgrades and therefore paid more than she. *See id.* Hogan also claims that she is subjected to a sexually hostile work environment at "The Today Show" where male crew members deliberately sabotage her work, laugh and snicker at her, refuse to speak to her directly, and "otherwise deliberately harass her." *Id.* ¶ 47.

### d. Hogan's Formal Complaints of Discrimination [10]

Hogan filed a Charge with the NYSDHR on October 29, 1999. *See* Ex. S to Reynolds Aff. ("Hogan Charge"), In that Charge, Hogan alleged that she was subjected to discriminatory treatment because of her national origin and sex. *See id.* In particular, Hogan complained that: (1) she was not allowed to work on the "Today Show" summer concert series as a Music Assistant Audio Engineer; (2) her name was removed from the Audio page and she was demoted to an Audio Assistant in January 1999; (3) NBC issued her a Letter of Warning for being late to work at the "Later Today" show as a result of a flat tire; and (4) because she did not receive the salary upgrade she was entitled to after she was promoted to a Senior Audio position on the "Later Today" show, she received less money than two white

---

**10.** Because the continuing violation doctrine does not apply to Hogan's claims, *see infra,* I do not discuss her Title VII claims that predate January 22, 1999, or her NYSHRL claims that pre-date August 3, 1997. Such time-barred claims include Hogan's claim

that Accarino retaliated against her for her 1995 complaint to the NBC Ombudsperson by removing her from "Conan" and her claim that she was subjected to a sexually hostile work environment while on "Conan." *See* Hogan 56.1 ¶¶ 24, 47.

male Audio Assistants who received merit upgrades. *See id.*

In a Complaint filed with this Court on August 3, 2000, Hogan complains of sex and race discrimination as well as sexual harassment. *See* Complaint ("Hogan Compl."), Ex. E to Reynolds Aff. In her Complaint, Hogan reiterates that she was denied additional assignments on "The Today Show" concert series by Scheduling Coordinator Julie Radin. *See id.* ¶ 69. She claims that numerous white male staff and non-staff engineers with far less experience than she were rotated onto the concert series. *See id.* Furthermore, throughout her regular assignment on "The Today Show" and "Weekend Today," Hogan has remained at the Group 2 pay level. *See id.* ¶ 70. Hogan alleges that she never received a merit upgrade while white male Audio Engineers with less experience were routinely awarded Group 5 merit upgrades. *See id.* While on "Later Today," Hogan was paid at the Group 2 level while two other Audio Assist Engineers, both white males, were paid at the higher Group 5 pay scale. *See id.* ¶ 71. In fact, Hogan alleges that she was reassigned to an Audio Position on "Later Today" in October of 1999, where she replaced Steve Singer, a white male paid at the Group 7 pay scale. *See id.* ¶ 72. Upon replacing Singer, Hogan claims that the position was immediately downgraded and Hogan remained at the Grade 2 level. *See id.*

Hogan also makes the following general allegations in her Complaint: (1) white males with less audio engineering skill than Hogan have regularly received merit upgrades; (2) Hogan has consistently been overlooked for high-profile assignments which are routinely given to white males;

(3) Hogan has been denied the opportunity to receive the training necessary to qualify for merit upgrades, training which is readily available to white males; and (4) Hogan has been denied fair compensation and bonuses throughout her employment at NBC. *See id.* ¶¶ 76–80. Hogan's claims of disparate treatment include retaliation by directors, officers, supervisors, managers and employees of NBC. *See id.* Hogan also alleges that, from Spring 1983 to the present, NBC has created and maintained a hostile work environment subjecting her to explicit, rampant, pervasive and continued sex discrimination and harassment. *See id.* ¶¶ 21, 26.

### 3. Little

#### a. Little's Experience in the Film Operations and Video Operations Departments

In 1981, NBC hired Little, who is African–American, to work as a film projectionist in its Film Operations Department. *See* NBC's Rule 56.1 Statement of Undisputed Facts ("Def.'s Little 56.1") ¶ 1; Plaintiff's Response to Defendant's Rule 56.1 Statement ("Little 56.1") ¶ 1. As a film projectionist, Little organized film chains to play material on the air.[11] *See* Little Dep. at 53. Little worked in Film Operations for eighteen months, at which point the department closed. *See* Def.'s Little 56.1 ¶ 2; Little 56.1 ¶ 2. Little then began to work in the Videotape Operations Department as a videotape engineer. *See* Def.'s Little 56.1 ¶ 3; Little 56.1 ¶ 3. As a videotape engineer Little dubbed, edited and played back videotape. *See* Little 56.1 ¶ 3. In approximately 1985, Little spent three months working as a temporary audio engineer for WNBC Local News. The

---

11. While the parties do not identify the activities of the Film Operations Department, it appears that it provides services to NBC in general, rather than to specific shows. *See* Little Dep. at 53.

parties refer to this temporary assignment as "vacation relief." [12] *See* Def.'s Little 56.1 ¶ 4; Little 56.1 ¶ 4. After completing this temporary assignment, Little returned to his previous position as a videotape engineer in the Videotape Operations Department, now under the supervision of Don Brookfield. *See* Def.'s Little 56.1 ¶ 5; Little 56.1 ¶ 5. From approximately 1985 to 1988, Little worked as a full-time videotape engineer.[13] *See* Def.'s Little 56.1 ¶ 6; Little 56.1 ¶ 6.

### b. Little's Experience with the Automated Recording and Playback System

In approximately 1988, NBC introduced new technology in the Videotape Operations Department, which was called the Automated Recording and Playback System ("ARPS"). Little was one of the employees in the Video Operations Department who received training in the system. *See* Def.'s Little 56.1 ¶¶ 8, 9; Little 56.1 ¶¶ 8, 9. After he was trained, Little became an ARPS operator in the Video Operations Department and retained that position for approximately eleven years, until the system was phased out in 1999.[14] *See* Def.'s Little 56.1 ¶ 11; Little 56.1 ¶ 11. Between 1993 and 1998 or 1999, Little periodically worked as an ARPS supervisor and received daily upgrades from Group 5 to Group 7. *See* Def.'s Little 56.1 ¶ 13; Little 56.1 ¶ 13. Little contends that his supervisory ARPS assignments were reduced beginning in 1996 and that Kevin Scott, who was directly responsible for Group 7 assignments, steered assignments to Little's Caucasian co-workers instead. *See* Little 56.1 ¶ 13.

Little also contends that Scott deliberately subjected African–American employees to harsher scrutiny, higher standards and stricter discipline than their Caucasian counterparts during Little's tenure as an ARPS operator. *See* Little 56.1 ¶ 27. He describes one occasion that was sparked by his response to an NBC employee who threw Little's paycheck at him. Little responded to this behavior by telling the employee that he would probably be suspended if he treated a client that way. *See* Little Dep. at 176–78. Moments later, Little was summoned into Scott's office where he was informed that Accarino had instructed Scott to take Little's employee ID and escort him off the premises. *See id.* Scott also threatened to suspend Little if he discovered that Little was lying about the incident. *See id.* Approximately two weeks later, Little was informed that he would not be suspended. *See id.*

Little also alleges that Scott told a former union supervisor, Max Collins, that he expected more from African–American employees than from their Caucasian counterparts. Scott explained to Collins that he bent over backwards not to show favoritism toward minorities because he was afraid that Accarino would fire him "if he was soft on African–American workers." *See* Affidavit of Max Collins, Ex. A to McBrayer Aff. ("Collins Aff.") ¶¶ 9, 10;

---

12. While the parties do not define "vacation relief", it appears that employees may apply for such temporary assignments when they wish to seek a variety of work assignments. *See* Def.'s Little 56.1 ¶ 4; Little 56.1 ¶ 4.

13. Little continued to apply for and receive temporary vacation relief positions with WNBC during this period. *See* Def.'s Little 56.1 ¶ 6; Little 56.1 ¶ 6.

14. NBC claims that, while working as an ARPS operator, Little was supervised by several different individuals, including Bob Doherty, Kevin Scott (who is African–American) and Ron Lynah (who is African–American). *See* Def.'s Little 56.1 ¶ 12. Plaintiff contends, however, that his only supervisors during this period were Bob Doherty and Kevin Scott. *See* Little 56.1 ¶ 12.

November 6, 2001 Affidavit of Kyle Little attached to McBrayer Aff. ("Little Aff.") ¶ 4. According to Collins, Scott became increasingly angry and hostile and threatened to blow up NBC on numerous occasions before NBC removed him from the facility. *See id.* ¶ 12.

Little also alleges that Scott instructed Little and John Rivera (a co-worker of African–American and Hispanic heritage) to keep track of their Italian co-workers and to watch when they were coming and going. *See* Little Dep. at 166–73. Little and Rivera refused to cooperate in this activity. *See id.* In addition, on numerous occasions Scott referred to female employees in a derogatory manner and shouted obscenities in Little's presence or directly at female co-workers. *See id.* at 152, 156–58. Little also refused to participate in this activity. *See id.*

### c. Denial of Little's Transfer Request

Little contends that, in 1996, NBC denied his request to transfer to the office of an NBC affiliate, WMAQ in Chicago. *See id.* at 17–19, 139. Little travelled to Chicago and was interviewed by three individuals at WMAQ, including Ken Harvey. *See id.* at 139–40. When Harvey attempted to speak with Scott regarding Little's application, he received no response. *See id.* at 135–43. According to Little, when he approached Scott regarding the transfer, Scott told him that the transfer was not going to happen because he did not support it. *See id.* at 143. Subsequently, Harvey told Little that Scott had been uncooperative when he attempted to discuss Little's application and that WMAQ had hired another applicant. *See id.* at 143–44.

### d. Little's 1998 NYSDHR Charge

On May 8, 1998, Little filed a discrimination claim with the NYSDHR and the EEOC. *See* Ex. P to Reynolds Aff. ("Little Charge"). Little filed supplemental charges with the NYSDHR on March 23, 1999 and May 17, 1999. *See* Def.'s Little 56.1 ¶ 25; Little 56.1 ¶ 25; Ex. P to Reynolds Aff. ("Little Supp. Charge"). On May 8, 1998, Little met with NYSDHR Investigator David Powell to discuss his claims of race discrimination, racial harassment and retaliation. *See* Little Aff. ¶ 1. Little explained to Powell that Scott discriminated against African–American employees, even though Scott was also African–American. *See* Little Dep. at 160–61. Little claims that he was later informed by his African–American colleague Dennis Murray that Scott had instructed Murray to tell Little to drop the charges because they were making Scott look bad.[15] *See id.*

### e. Exclusion from Graceland Training and Return to Video Operations

In 1999, when ARPS became obsolete, NBC replaced the system with a technology known as Graceland. *See id.* at 187–88. Little claims that when Graceland was first introduced no African–American employee received training on the new system while the training was provided to all but one of his Caucasian co-workers. *See id.* at 189, 191, 194–199. He admits, however, that three African–Americans (himself excluded) later received the opportunity to work with Graceland. *See id.* at 191. According to Little, his exclusion from Graceland decreased his overtime work and made him more vulnerable to company layoffs. *See id.* at 195.

15. Little also alleges that, whereas the customary practice at NBC was to review attendance records for only the previous two or three years, NBC responded to his charge by reviewing his records for the last five years. *See* Little Dep. at 241–46.

Without Graceland training, Little was reassigned as a Group 5 videotape operator in the Video Operations Department. *See* Def.'s Little 56.1 ¶ 14; Little 56.1 ¶ 14. He insists that his return to the Video Operations Department was a demotion because he worked in a non-supervisory capacity as a Group 5 videotape operator and did not receive daily upgrades to Group 7. *See* Little 56.1 ¶ 14. Little further contends that, when a Group 7 position became available in August 1999, his supervisor Chris Dee denied his request for this position. *See* Little Dep. at 201, 203, 205. Rather than posting the available position, Dee offered the position to two Caucasian employees and eventually promoted a Caucasian employee who was less experienced than Little. *See id.* at 212–14.

Little also alleges that, in 1999 and 2000, Dee did not respond to his repeated requests for a promotion to an AVID[16] editorial position. *See* Little 56.1 ¶ 17; Little Dep. at 213. Although Little had received training on AVID in a non-NBC course, he had no AVID editing work experience. *See* Def.'s Little 56.1 ¶ 16. Little admits that on one occasion, when he requested this promotion, in approximately late March or early April 2000, there was no AVID editing position available. *See id.* NBC contends that the AVID editing position became available while Little was on disability leave in 1999 and, by the time he returned and requested the position, it was

no longer available.[17] *See* Def.'s Little 56.1 ¶¶ 15, 17, 18.

#### f. Little's Current Assignment and Formal Complaint

In approximately March or April 2000, Little began to work as an AVID Digitizer/Dub Room Operator. *See* Def.'s Little 56.1 ¶ 21; Little 56.1 ¶ 21. He claims that he had previously declined this position because he sought a position as an AVID editor and because the Digitizer work schedule conflicted with his court-ordered child custody arrangement. *See* Little Dep. at 217, 257–258, 331, 335. In May or June 2000, NBC provided Little with five weeks of training in AVID digitizing. *See* Def.'s Little 56.1 ¶ 23; Little 56.1 ¶ 23. In this position, Little is supervised by Patrice Murphy and receives Group 5 pay. *See* Def.'s Little 56.1 ¶ 24; Little 56.1 ¶ 24.

On May 12, 2000, Little filed a Complaint with this Court alleging the following claims: (1) racial harassment, race discrimination and retaliation in violation of Title VII; and (2) race discrimination and retaliation in violation of the NYSHRL. *See* Complaint ("Little Compl."), Ex. B to Reynolds Aff., ¶¶ 55, 59.

On June 21, 2000, Little saw Ku Klux Klan robes hanging on the front of a wardrobe rack in the exterior hallway at NBC's headquarters. *See* Little Aff. at ¶ 10; Photograph of Robes, Ex. C to McBrayer Aff. Little further claims that during the Fall of 2000 employees were encouraged to watch a tape of an NBC employee dressed

---

**16.** AVID is a non-linear editing technology, which is used for NBC programming. *See* Little Dep. at 210.

**17.** NBC contends that the individual who received the AVID editing position is a Daily Hire and that Little knew nothing about this individual's work and editing experience. *See* Def.'s Little 56.1 ¶¶ 19, 20. Little acknowledged that he did not know whether the promotion of this Caucasian male occurred dur-

ing his disability leave or after his return to NBC in April 1999. *See* Little 56.1 ¶¶ 18, 19. Little contends, however, that he and that individual started the non-NBC AVID training course at the same time, but that the individual received an unfair advantage because NBC allowed him to complete his training by using NBC equipment and observing NBC editors. *See id.* ¶ 20.

in "blackface" that was shown over closed-circuit feed studio monitors throughout the NBC facility. *See* Little Aff. ¶ 12. He also claims that, in June 2001, he saw a noose hanging in the second floor video-tape maintenance shop with the name of his African–American co-worker Joseph Meyers taped to it. *See id.* ¶ 11; Photograph of Noose, Ex. D to McBrayer Aff.

### g. Continuing Denials of Little's Requested Work Assignments

Little also contends that NBC has routinely denied his requests to work with the Olympics, a prestigious assignment that provides opportunities for overtime and significant expense allowances for travel. *See* Little Aff. ¶¶ 8–9. In addition, NBC has repeatedly failed to honor his requests for a work schedule that would allow him to comply with his court-ordered child custody obligations. *See* Little Dep. at 229–30. He admits, however, that NBC has made such accommodations for other minority employees. *See id.*

### 4. Rivera

Rivera, who is half Hispanic and one-quarter African–American, was hired by NBC in 1982 as a Librarian in the Videotape Department. *See* NBC's Rule 56.1 Statement of Undisputed Facts ("Def.'s Rivera 56.1") ¶ 1; Rivera's Response to Rule 56.1 Statement ("Rivera 56.1") ¶ 1. When he was hired, Rivera was at the Group 2 wage scale. *See* Def.'s Rivera 56.1 ¶ 8; Rivera 56.1 ¶ 8. In 1985, he was transferred to Technical Supplies. Rivera claims that, from the beginning of his employment, his co-workers, including Tony Soulet, a Hispanic co-worker, called him "spic, Bombo, [and] cokehead" and posted cartoons with the name "Bombo" on his desk. *See* Rivera Dep. at 46–47, 338; *see also* Bloom County Cartoon, Ex. P to McBrayer Aff.; Def.'s Rivera 56.1 ¶¶ 2–3;

Rivera 56.1 ¶¶ 2–3. Rivera says that, around 1987 or 1988, he began to speak to NBC Director of Diversity Al Jackson about "issues pertaining to minorities in the workplace." Rivera Dep. at 285. In 1989, he became a Camera Operator. *See* Def.'s Rivera 56.1 ¶ 3; Rivera 56.1 ¶ 3.

#### a. Rivera's Experience in the Videotape Department

In 1991, Rivera was transferred back to the Videotape Department and promoted to Videotape Operator. *See* Def.'s Rivera 56.1 ¶ 7; Rivera 56.1 ¶ 7. He enrolled in a six-week training course to prepare for this position, after which he received a raise to the Group 3 pay. *See* Def.'s Rivera 56.1 ¶¶ 9–10; Rivera 56.1 ¶¶ 9–10. About this time, he claims to have heard Director of On–Air Operations Don Brookfield say to another person, "Puerto Ricans don't take care of their kids." Rivera Dep. at 152.

In 1992, Rivera asked his supervisor Emil Marzullo for a "CMX Editing Position." *Id.* at 172. Marzullo responded that he was not sure a position was available. *See id.* at 175. Rivera claims that he visited Marzullo approximately seventeen times to "follow up" but that nothing ever came of his request. *Id.* at 181–82. Rivera also claims to have applied to work on the 1992 Olympics; his application was not approved. *See id.* at 220–21.

In 1993, Rivera was promoted to Videotape Supervisor but did not receive a raise. *See* Def.'s Rivera 56.1 ¶¶ 11, 13; Rivera 56.1 ¶¶ 11, 13. Rivera alleges that Brookfield protested the promotion, claiming he was not qualified for the position. *See* Rivera Dep. at 147. Others allegedly complained about Rivera's "huge attendance issues," and said that his promotion would "cause a morale issue in the Department." *Id.* at 343. Rivera claims that Brookfield launched a six-month investigation into his

background and work record. *See id.* at 147. This investigation, however, did not affect the promotion. *See id.* at 349.

After becoming a Videotape Supervisor, Rivera says that he told Ron Lynah, a manager in the Videotape Department, that he was seeking a position as a Technical Director. *See id.* at 71. According to Rivera, although he requested ARPS training from Lynah, he never received the training while Caucasian co-workers did. *See id.* at 237, 244. On December 1, 1993, Rivera claims he found the phrases "Bombo ill" and "Bombo sickness in family" written on his schedule. *Id.* at 263–64. He "immediately logged it" in the NBC labor relations log. *Id.* at 264; *see also* 12/1/93 Videotape Operations Log, Ex. Q to McBrayer Aff.

In 1994, Rivera again requested a promotion to Technical Director by sending an email to Accarino, Steve Fastook (a member of NBC management) and Lynah. *See* Rivera Dep. at 62. He also requested training for the Technical Director position from many people, including Technical Manager Alina Chaban, Manager of Operations Robert Doherty, Accarino, and Fastook. *See id.* at 245. He never received this training. *See id.* at 249.

Rivera's immediate supervisor in the Videotape Department was Robert Doherty, who reported to Kevin Scott. *See id.* at 41. Scott, who is African–American, was Director of Operations. *See id.* at 38. Rivera and Scott had previously been quite close: Rivera served as best man at Scott's wedding, they spent time together socially outside of work, they vacationed together, and Scott's son called Rivera "Uncle John." *See* Def.'s Rivera 56.1 ¶¶ 16–19; Rivera 56.1 ¶¶ 16–19. Rivera claims that his friendship with Scott deteriorated soon after Scott became his superior. *See* Rivera Dep. at 42.

In 1994 or 1995, Rivera claims that Scott told him that Accarino had referred to Ron Lynah and Max Collins, both African–American managers, as "his pimps." *Id.* at 282–83. Also around this time, Rivera claims that Kevin Mulrini, a co-worker in the Videotape Department, saw Rivera take a videotape machine and synchronize it with a television program. Rivera performed this feat so rapidly that Mulrini allegedly yelled, "[he's] not Puerto Rican, [he's] a white European." *Id.* at 259. When Rivera's co-worker Jose Alvarez lost his job, Rivera claims Mulrini looked at him and said, "I thought we were going to get two for the price of one. What are you still doing here?" *Id.*

On February 23, 1995, Rivera emailed Rich Cervini and asked him about becoming a Technical Director. *See* 2/23/95 email from John Rivera to Rich Cervini, Ex. K to McBrayer Aff. On May 19, 1995, Rivera emailed Accarino about becoming a Technical Director. *See* Rivera Dep. at 74–75; 5/19/95 email from John Rivera to Accarino, Ex. L to McBrayer Aff. On May 24, 1995, Rivera emailed Scott and Collins about becoming a Technical Director. *See* 5/24/95 email from Rivera to Scott and Collins, Ex. M to McBrayer Aff. Again, he was not promoted to or trained for the position.

In May or June 1995, Rivera alleges that he was approached by Scott and asked to "set up" two of his Caucasian co-workers for disciplinary action. Rivera Dep. at 206. Rivera further alleges that, in July of 1995, Scott told him to "ride [the] ass" of Charles Giles, a Caucasian co-worker. *Id.* at 206–07. Rivera says that he refused these requests and accused Scott of "act[ing] like the Caucasian NBC management." *Id.* at 208. Rivera claims that he also heard Scott refer to his co-worker Ella Lafayette as a "fucking black bitch." *Id.* at 262–63.

On September 14, 1995, Rivera applied for the management position of Scheduling Coordinator by sending an email to Scott, Collins, and Doherty, among others, stating, "I would like to be considered for the scheduling position that you may or may not be creating." 9/14/95 email from John Rivera to Collins, Doherty, Scott, Steve Milbrod and Art Waardenburg, Ex. N to McBrayer Aff; Rivera Dep. at 198. Rivera claims that Scott yelled and cursed at him after receiving this email. *See* Rivera Dep. at 199–202. Rivera also claims that, on October 20, 1995, Scott accused him of drug abuse, ordered him to take medical leave and threatened him with termination if he refused to comply. *See* Affidavit of John V. Rivera ("Rivera Supp. Aff."), Ex. R to Reynolds Aff.

### b. Rivera's Demotion from the Supervisor Position

At some point around March 1995, Rivera was demoted from his Videotape Supervisor position to the position of Videotape Operation.[18] *See* Def.'s Rivera 56.1 ¶ 14; Rivera Dep. at 38. Scott and/or Doherty made the decision to demote Rivera after a complaint made by an "internal 'sports client.'"[19] Def.'s Rivera 56.1 ¶ 15; Rivera Dep. at 38, 269–70. At any rate, Rivera was made a Videotape Operator once more; Tony Soulet, who is Hispanic, replaced him as Supervisor. *See* Def.'s Rivera 56.1 ¶¶ 20–21; Rivera Dep. at 46–47. Rivera claims that, after his demotion,

he received only "very infrequent" daily upgrades and incurred "a significant loss of overtime." Rivera Dep. at 49–50; *see also* Rivera 56.1 ¶ 21.

On May 16, 1996, Rivera testified on behalf of Giles, who had filed a complaint with the NYSDHR. *See* Rivera Supp. Aff. ¶¶ 1, 3; Rivera Dep. at 375. In November 1996, Scott allegedly "physically menaced" and "stalked" him by blocking his entrance to the Rockefeller Center building. *See* Rivera Dep. at 376; Ex. R to Reynolds Aff. ("Rivera Charge") ¶ 3(d). According to Rivera, Scott stood "six, ten feet away" and stared him down and did not make way for him to enter the building. Rivera Dep. at 376. Rivera says that he reported the incident to a union representative. *Id.* at 381.

In the latter half of 1996, Rivera was assigned to work on the "Maureen O'Boyle Show" ("O'Boyle"). *See id.* at 52. He claims that, because his duties at "O'Boyle" did not give him the opportunity to work overtime, he asked Doherty for a permanent upgrade to Group 6 pay. *See id.* at 52, 115–118. When Doherty refused, he allegedly told Rivera that giving him a raise would cause "perception problems" and that he "didn't deserve it." *Id.* at 120. Rivera also claims that his request to work on the 1996 Olympics was denied. *See id.* at 221–22; Rivera Charge ¶ 3(b). When one of Rivera's co-workers asked at a staff meeting later in 1996 why more minorities

---

18. The exact date of his demotion is disputed. NBC claims it was March 1995, *see* Def.'s Rivera 56.1 ¶ 14, but Rivera variously identifies the date as "on or about March 5, 1996," Complaint ("Rivera Complaint"), Ex. D to Reynolds Aff., ¶ 57, "approximately March 1996," Rivera 56.1 ¶ 37, March 1995, *see id.* ¶ 34, "approximately March 1995," *id.* ¶¶ 14, 21, and February 1996, *see id.* ¶ 38. In his deposition, Rivera stated that the demotion occurred in "approximately 1995." Rivera Dep. at 37. The date of the demotion, of course, determines whether it occurred before

or after Scott allegedly told him to "ride" Giles, before or after Scott allegedly yelled and cursed at him, and before or after Scott allegedly accused him of drug abuse and ordered him to take medical leave.

19. Rivera says that he does not know whether Scott or Doherty made the decision to have him removed. *See* Rivera Dep. at 269. NBC says that Scott made the decision. *See* Def.'s Rivera 56.1 ¶ 15.

weren't assigned to the Olympics, Accarino allegedly said that it was not up to him because Laura Klein had that authority.[20] *See* Rivera Dep. at 234.

### c. Rivera's Experience on "Conan"

On June 3, 1997, Rivera was assigned to the Videotape Department on "Conan" to "restore confidence" in the show. *See* Def.'s Rivera 56.1 ¶¶ 22–23, Rivera 56.1 ¶¶ 22–23. Rivera had previously been unassigned, because "O'Boyle" had gone off the air. *See* Def.'s Rivera 56.1 ¶ 24; Rivera Dep. at 54. Rivera admits that it was more "prestigious" to be assigned to one show than to be unassigned. Def.'s Rivera 56.1 ¶¶ 24–25; Rivera Dep. at 54. He also admits that the position resulted in increased compensation through daily upgrades to Group 5 pay four days out of the five-day work week. *See* Def.'s Rivera 56.1 ¶ 26; Rivera Dep. at 56. Nevertheless, Rivera insists that the assignment was a "downgrade" because the show had a "terrible reputation" and his work on the show was less challenging. Rivera Dep. at 56.

Rivera claims that he protested this assignment to Chaban, who referred him to Scott. *See id.* at 59. Scott purportedly responded, "too bad." *Id.* at 60. Rivera claims that he "immediately" applied for a Technical Director position. *Id.* at 76–77. When he met with Fastook and Chaban, Fastook allegedly agreed that the "Conan" assignment was a "setback." [21] *Id.* at 77. Rivera told Fastook that he would work on "Conan" for six months, but that he then wanted to be promoted to Technical Director. *See id.* at 81; Def.'s Rivera 56.1

¶ 27. Rivera did not know, however, of any open Technical Director positions. *See* Def.'s Rivera 56.1 ¶ 28; Rivera Dep. at 81.

In June 1997, Rivera claims that Collins called him to Scott's office for a meeting concerning his assignment to "Conan" and his interactions with Chaban in particular. *See* Rivera Dep. at 313–14. After leaving the meeting, Rivera claims that he heard Scott yell, "I'll wait for that motherfucker at the Port Authority." [22] *Id.* A few weeks later, on July 3, 1997, Rivera received a Written Letter of Warning from Chaban for being absent from his assignment on "Conan". *See* 7/3/97 Written Warning Letter, Ex. JJ to Reynolds Aff; Rivera Dep. at 292. Rivera claims that the accusation is "a complete and total lie." Rivera Dep. at 292.

On February 11, 1998, Rivera received a Letter of Final Warning from Scott accusing him of being absent from an assignment on January 13, 1998 and of being late on February 9, 1998. *See* 2/11/98 Letter of Final Warning, Ex. KK to Reynolds Aff.; Def.'s Rivera 56.1 ¶ 33; Rivera 56.1 ¶ 33. The letter stated that Rivera's absenteeism "ha[d] been a continuing problem" and informed Rivera that his pay would be docked for time missed. 2/11/98 Letter of Final Warning. Rivera says he met with Collins, Scott, and Gene Garnes to discuss the letter. *See* Rivera Dep. at 322.

### d. Rivera's Formal Complaints and Surrounding Events

On February 13, 1998, two days after receiving the Final Warning Letter, Riv-

---

**20.** Rivera does not know, and Accarino did not indicate, the position held by Laura Klein. *See* Rivera Dep. at 234.

**21.** Rivera also "believe[s] my entire career has been a setback because of race." Rivera Dep. at 61.

**22.** Rivera explained that every morning he takes a bus from New Jersey to the Port Authority. *See* Rivera Dep. at 330.

era met with Richard Frank of the NBC Ombudsman's Office. *See* Rivera Dep. at 361–69. Rivera again met with Frank on February 19, 1998. *See id.* Rivera claims that he complained to Frank about "the problems in the department, the racism, the discrimination, the behavior, the fact that I felt I was being targeted for dismissal." *Id.* at 366. Rivera complains that, although the Ombudsman's Office told him that it would investigate his complaint, nothing was done. *See id.* at 372. As a result, he filed a charge with the NYSDHR on April 17, 1998. *See* Rivera Charge. His Charge alleges that various actions by NBC were made in retaliation for his 1996 sworn statement in support of Giles, including having his name "whited out" from the schedule, not being assigned to the 1996 Summer Olympics, the "stalking" incident with Scott, being "ordered to perform a job for which [he] was not qualified," and various accusations of absenteeism. *Id.* ¶ 3(a)-(i).

On August 31, 1998, Rivera emailed Chaban and asked to be given the position of backup Technical Director. *See* 8/31/98 email from Rivera to Chaban, Ex. GG to Reynolds Aff. Chaban replied via email that her "office was always open." Def.'s Rivera 56.1 ¶ 31; Rivera 56.1 ¶ 31. Rivera did not respond to this email or speak to Chaban. *See* Def.'s Rivera 56.1 ¶ 32; Rivera Dep. at 87. Rivera says that he instead spoke to Plonka, who told him that Chaban did not want Rivera to have the position, and that she "had issues" with him. Rivera Dep. at 87. Rivera also spoke to Fastook, who was Chaban's superior, and Technical Director Greg Aull about the incident, but nothing came of those conversations. *See id.* at 88–89.

On March 12, 1999, Rivera filed a Supplementary Affidavit with the NYSDHR. *See* Def.'s Rivera 56.1 ¶ 35; Rivera 56.1 ¶ 35; *see also* Rivera Supp. Aff. Rivera

and NBC later arbitrated their dispute, discussing NBC's rejection of Rivera's promotion requests and Scott's alleged retaliation. *See* 11/6/01 Affidavit of John Rivera ("Rivera Aff.") ¶ 10. The discussions culminated in a tentative arbitration agreement dated July 8, 1999. *See* Settlement Agreement, Ex. I to McBrayer Aff. The agreement stipulated that Rivera would receive training as a Technical Director. *See id.* The agreement was never signed; Rivera claims this was due to NBC's reluctance to "allow NYSDHR to monitor its workplace." Rivera Aff. ¶ 10.

Rivera claims that he requested time off in September 1999 to take his son to college. *See* Rivera Dep. at 135. Christopher Dee, Manager of Videotape Operations, denied his request. *See id.* Rivera then spoke to Mills and alleges that Mills said, "Here you go again, you people think you can just do whatever you want at the last minute." *Id.* at 136. When Rivera demanded to know what Mills meant by "you people," Mills explained that Rivera had a history of "waiting for the last possible minute." *Id.* at 136–37.

On November 18, 1999, Rivera received a letter from Dee documenting an earlier verbal warning. *See* 11/18/99 Commemoration of Verbal Warning, Ex. HH to Reynolds Aff.; Def.'s Rivera 56.1 ¶ 33; Rivera 56.1 ¶ 33; Rivera Dep. at 158–161. Dee warned Rivera that he was approaching his limit of sick days taken in one year and that his "current number of absences [was] considered excessive and unsatisfactory by [the] Department." 11/18/99 Commemoration of Verbal Warning.

On January 10, 2000, Dee sent Rivera another letter concerning Rivera's absences in 1999. *See* Def.'s Rivera 56.1 ¶ 33; 1/10/00 Letter of Written Warning, Ex. II to Reynolds Aff.; Rivera Dep. at 161. This letter, which was a follow-up to a verbal warning in November 18, 1999,

informed Rivera that his nine "sporadic illness days" taken for the year 1999 constituted "continuous excessive absenteeism." 1/10/00 Letter of Written Warning. Rivera claims that a similar warning letter was sent to one other employee, Floyd Webb. *See* Rivera Dep. at 161–62.

On February 17, 2000, NYSDHR issued Rivera a Right to Sue Letter. *See* 2/17/00 Notice of Right to Sue, Ex. H to McBrayer Aff. On May 12, 2000, Rivera filed a Complaint with this Court, alleging: (1) racial harassment, discrimination, and retaliation in violation of Title VII; and (2) racial harassment, discrimination, and retaliation in violation of the New York State Human Rights Law. *See* Def.'s Rivera 56.1 ¶ 36; Rivera Compl.

Rivera additionally claims that, at some time in 2000, a Technical Director position was filled. *See* Rivera Dep. at 290. Rivera says that he had not been notified of any open Technical Director position, that the vacancy was never posted, and that he was not considered for the position. *See id.*

On June 22, 2000, Rivera saw Ku Klux Klan robes hanging on the wardrobe rack outside the "Conan" control room. *See* Rivera Dep. at 411–13; Rivera Aff. ¶¶ 12–14. Rivera left work, purchased a camera, and took a picture of the robes. *See* Rivera Dep. at 411–12; *see also* Photograph of Robes, Ex. C to McBrayer Aff. In his deposition, Rivera stated that he did not complain to anyone or ask why the robes were there, *see* Rivera Dep. at 413; however, his affidavit states that he "immediately reported this incident to NBC Director of Diversity Tony Loney." Rivera Aff. ¶ 14. Rivera admits that he does not know whether the robes were used as costumes for "Conan". Rivera Dep. at 412–13. In the Fall of 2000, Rivera saw a videotape being played over closed-circuit television throughout NBC during an affiliate conference. *See* Rivera Dep. at 407–08; Rivera Aff. ¶ 18. The tape showed a local reporter and a man in blackface and a cape, with the captioned name of "Count D'Ballot." *See* Rivera Dep. at 407–08; Rivera Aff. ¶ 18; Video Still, Ex. R to McBrayer Aff. Rivera alleges that he again asked Fastook to be promoted to Technical Director in the Fall of 2000, and that Fastook promised he would be trained. *See* Rivera Aff. ¶ 19. To date, Rivera has not received this training. *See id.*

On June 21, 2001, Rivera alleges that he, Kyle Little, and another co-worker, Joshua Meyers, saw a noose hanging near Meyers's work area with Meyers's name attached. *See* Rivera Aff. ¶ 15. Rivera took a picture of the noose. *See* Photograph of Noose, Ex. D to McBrayer Aff.; Rivera Aff. ¶ 17. According to Rivera, Muro reported this incident to NABET President Louis Fallot who called NBC Employer Relations Director Alexandra McCauley. *See* Rivera Aff. ¶ 16. While McCauley came to view the noose and said she would investigate, Rivera claims that the noose stayed up for two weeks. *See id.* ¶¶ 15, 16.

### 5. Perez

#### a. Perez's Experience at NBC from 1987–1993

Julie Perez is of Puerto Rican and Irish/Scottish descent. *See* NBC's Rule 56.1 Statement of Undisputed Facts ("Def.'s Perez 56.1") ¶ 10; Perez's Response to Defendant's Rule 56.1 Statement ("Perez 56.1") ¶ 10. She was hired by NBC in 1984 as an Audio Engineer. *See* Def.'s Perez 56.1 ¶ 10; Perez 56.1 ¶ 10. From 1987 to 1993, Perez worked as an Assistant Music Mixer on "Saturday Night Live," where she was supervised by several individuals including Mike Matthews, Fabio Toscano, and Keith Handyside. *See* Def.'s Perez 56.1 ¶¶ 11, 12; Perez 56.1

¶¶ 11, 12. While she worked on "Saturday Night Live", Perez was on the Group 2 pay scale; however, she was given daily upgrades to Group 3 pay when she operated the videotape machine. *See* Def.'s Perez 56.1 ¶¶ 11, 27; Perez 56.1 ¶¶ 11, 27.

In 1990, Perez discovered that male NBC employees on the set of the show "House Party" set up cameras in order to tape bathing suit models as they changed in and out of their bathing suits. *See* Perez Dep. at 525–32. When she reported this incident to management, two of the employees and the show's director were fired. *See id.* She claims that, after she "blew the whistle" on these two employees, Fabio Toscano and other members of NBC management re-assigned her almost exclusively to A–2 assistant positions for the next eighteen months. *See id.* at 497, 542–43, 551–4; *see also* Perez 56.1 ¶ 47. That year, a co-worker allegedly informed Perez that there was a discussion regarding her sexual orientation and speculation that she was a lesbian because she "[didn't] give the guys any play." Perez Dep. at 573–74, 818–28.

### b. Perez's Experience on "Conan"

In 1993, NBC offered Perez the position of Senior Production Mixer on the newly launched variety show "Conan". *See* Def.'s Perez 56.1 ¶ 14; Perez 56.1 ¶ 14. Perez turned down the position because she preferred a position as a Music Mixer. *See* Def.'s Perez 56.1 ¶ 16; Perez 56.1 ¶ 16. She obtained that position in 1993 and still holds it today. *See* Def.'s Perez 56.1 ¶¶ 16, 22; Perez 56.1 ¶¶ 16, 22. When Perez began on "Conan", she remained a Group 2 employee and received daily upgrades to Group 6 and Group 7 on the days that the show was in production. *See* Def.'s Perez 56.1 ¶¶ 19, 28; Perez 56.1 ¶¶ 19, 28.

Only three shows produced by NBC in New York employ regular Music Mixers. *See* Def.'s Perez 56.1 ¶ 17; Perez 56.1 ¶ 17. The position is very prestigious and Perez is recognized as an accomplished Music Mixer. *See* Def.'s Perez 56.1 ¶ 17; Perez 56.1 ¶ 17. Perez was featured in a cover story in *EQ*, a trade magazine, *see id.* ¶ 18; *see also* Al Kooper, *The Late Shift*, EQ, Sept. 1999, Ex. LL to Reynolds Aff. (page unavailable). Plonka, the director of "Conan", testified that Perez does an excellent job and that she has received no complaints about Perez's work. *See* Deposition of Elizabeth Plonka ("Plonka Dep.") at 44, 57. NBC has never claimed that Perez was poorly reviewed or disciplined.

Perez claims that, during her tenure on "Conan", she was surrounded by sexually charged comments and behavior from co-workers and supervisors, some directed at her and some directed at others. *See* Perez Dep. at 650. Perez alleges that, in September 1994, Accarino came in the control room where she was working, ostensibly to congratulate her on a job well done. *See id.* at 455–72. During the course of a congratulatory handshake, he pressed her hand against his pants zipper. *See id.* After Perez complained to her Union President, Accarino and NBC's in-house counsel unexpectedly approached her and sent a "thinly veiled message" that she should keep the incident quiet.[23] *Id.* at 506–512. Perez also alleges that, between 1995 and 1998, Accarino refused her numerous requests for promotions or for upgrades to Group 7 or 8 status. *See* Supplemental Improper Practice Charge and Statement

---

**23.** She also alleges that she was informed by the Union Vice President that Accarino, the Vice President of News Entertainment and Facilities Operation, was alerted whenever models appeared on an NBC show so that he could "check out" the women. *See* Perez Dep. at 557–59.

of Julie Perez ("Perez Supp. Charge") ¶ 9, Ex. Q to Reynolds Aff.

Perez also alleges that Fred Zeller, the Senior Audio Engineer on "Conan", made sexual comments, physically menaced her, treated male and female employees differently, and engaged in flirtations with female crew members. On one occasion in 1993, when Perez told Zeller that she had a new baby nephew, he replied by saying that when he watched the birth of his first child he observed that "[a]fterwards [his] wife's vagina was so big [he] could have jammed [his] fist in there." Perez Dep. at 623–24; *see also* Perez Supp. Charge ¶ 7. As Zeller made this comment, he moved his fist in a punching motion. *See* Perez Dep. at 623–24; *see also* Perez Supp. Charge ¶ 7. Perez also alleges that Zeller regularly yelled at and belittled female audio engineers while treating male engineers in a collegial manner, and that, in 1995, he slammed a door in her face and once attempted to sabotage her work. *See* Perez Dep. at 627–29; Affidavit of Julie Anna Perez ("Perez Aff.") ¶ 12. According to Perez, in 1998 she observed Zeller giving massages to female crew members, including Plonka. *See* Perez Dep. at 630–35; *see also* Plonka Dep. at 104, 133, 165. Furthermore, Perez alleges that, in 2000, she heard a recording of a female voice saying "I love to suck cock" playing at a high volume emanating from Zeller's office. *See* Perez Dep. at 636–8; Perez Aff. ¶ 18.

According to Perez, Kevin Hartmann, a daily hire on "Conan", physically menaced her and made sexually charged comments about her and others on the show. Hartmann nearly dropped a 75–pound monitor on her in 1996, pushed her on one occasion in 1998, and physically prevented her from entering her control room in 1999. *See* Perez Dep. at 723–24, 647. In 1998, Perez overheard Hartmann ask a male NBC page whether he wanted to join the "Man Boy Love Association". *See id.* at 649. In 1999, Hartmann called Zeller a "prick" as Perez passed by and repeatedly commented that "it smells like fish" when Perez was the only female in the vicinity. *Id.* at 648, 710–15. Perez also claims that Hartmann was generally hostile and uncooperative when he was assigned to her crew, often refusing to perform a task unless Perez relayed her instructions through a male colleague. *See id.* at 707; Perez Aff. ¶ 6.

█ In addition to the specific actions of Accarino, Zeller, and Hartmann, Perez alleges that there have been other miscellaneous instances of sexual comments and behavior at NBC. In 1996, Perez witnessed a projection by NBC employees Chris Sieger and Jay Vicari of a photograph of a woman masturbating. *See* Perez Dep. at 740–41. Perez reported the incident to her superiors but NBC took no action against either employee. *See* Perez Aff. ¶ 15. Beginning in July 1997, a poster of the actress Jennifer Aniston scantily dressed was displayed for several months; it was removed when Perez complained. *See id.* ¶ 17; *see also* photograph of Jennifer Aniston poster, Ex. X to McBrayer Aff. In addition, Plonka displayed a cartoon of a woman performing fellatio on a man in her office. *See* Plonka Dep. at 79–80. Since 1999, an enlarged photograph of a male NBC employee embracing a model with a cartoon bubble coming from her mouth stating "Oh Randall, I never knew you were so big" has been displayed outside the "Conan" control room. *See* Perez Aff. ¶ 23; *see also* photograph of Randall poster, Ex. Y to McBrayer Aff. In 2000, a "Conan" audio crew member gave Perez a tape to perform a sound check on that was vulgar and contained the voice of a woman moaning: "I love to suck cock." Perez Aff. ¶ 20. In 2001, a can of "Penis Enlarge-

ment Spray" was displayed in the room outside of the "Conan" studios for about a week.[24] *See id.* ¶ 22.

Perez also alleges that while on "Conan" she has been subject to racially charged comments and conduct. In 1996, Alina Chaban, one of Perez's supervisors, commented to Perez that she didn't look Puerto Rican. *See* Perez Dep. at 222–23, 252–53. In 1996, and again in 1999, Chaban stated that Perez "had a Latin temper". *Id.* at 248–49; *see also id.* at 255. In 1997, a co-worker told Perez: "You have a typical Latin ass; the bigger the cushion, the better the pushin'." Perez Aff. ¶ 16. In 1999, Perez overheard James Marshall, then Technical Director on "Conan", comment: "The KKK have things under control in my town; all they have to do is show their guns." *Id.* ¶ 10. In 2000, Perez observed Klu Klux Klan robes displayed outside the "Conan" control room. *See id.* ¶ 19.

### c. Training and Assignments Outside of "Conan"

In addition to her position on "Conan", Perez received assignments on some of NBC's special broadcasts. Perez was granted assignments on NBC's broadcast of the Macy's Thanksgiving Day Parade from 1990–92, NBC's "Millennium Show" in 1999,[25] as well as the 1996 and 2000 Olympics. *See* Def.'s Perez 56.1 ¶¶ 23, 24, 25; Perez 56.1 ¶¶ 23, 24, 25. Perez also received training for audio production on

shows other than "Conan" and on technical equipment not used on "Conan". *See* Def.'s Perez 56.1 ¶¶ 23, 24, 25; Perez 56.1 ¶¶ 23, 24, 25.

Perez contends that, although NBC has given her lucrative assignments and training, her Caucasian male peers have received better assignments and training. *See* Perez Dep. at 208–209, 211–14, 688, 696, 700–701, 691. For example, Perez was allowed to receive training on the solid state logics and Axiom console but, while NBC provided the training to her two male co-workers, she paid for the training herself and used personal time to complete it. *See id.* at 691. She also claims that NBC has refused her many requests for a PSC for work performed beyond her ordinary duties on "Conan". *See id.* at 285–289. Perez claims that during the Olympics she was relegated to a position at NBC's Rockefeller Center facility rather than at the Olympic site. *See id.* at 210, 213–14. On-site assignments are higher profile, pay more overtime, and provide an opportunity for an Emmy nomination. *See id.* In addition, Perez was only permitted to train on a new console in the "Conan" control room if she simultaneously performed the Olympics assignment. *See id.* at 212–213.

### d. Perez's Complaints Regarding Mistreatment

In 1995, Perez and two female co-workers met with the NBC Ombudsperson, Pa-

---

**24.** NBC argues that the incidents regarding the audio tape and the can of "Penis Enlargement Spray" are not properly before the court because they occurred after the close of discovery and were not included in any supplemental pleadings in accordance with Federal Rule of Civil Procedure 15(d). *See* Omnibus Reply Memorandum of Law in Further Support of NBC's Motions for Summary Judgment ("Def. Omnibus Repl. Mem.") at 16. However, "an issue presented for the first time in a motion for summary judgment may be considered and treated as an amendment

of the complaint." *Neri v. Coughlin*, No. 92 Civ. 7890, 1993 WL 464687, at *7 (S.D.N.Y. Nov.9, 1993). Because NBC responded to the allegations in its reply memorandum of law, I will consider them in this motion. *See id.*

**25.** Perez was chosen for this position over a white male co-worker, but was only offered the position after two male co-workers declined the opportunity. *See* Perez Dep. at 205.

tricia Langer, in order to complain about perceived sexual harassment in the workplace. *See* Def.'s Perez 56.1 ¶ 31; Perez 56.1 ¶ 31. After an investigation, Perez was told by Langer and her assistant that the investigation revealed no sex discrimination or harassment, but that she should report any further perceived harassment to management. *See* Def.'s Perez 56.1 ¶ 33; Perez 56.1 ¶ 33. Although Perez claims that she and her co-workers requested that the investigation be conducted outside of Accarino's presence, he was included in the one meeting held by the investigators. *See* Perez Dep. at 663–4. Perez contends that this investigation was ultimately incomplete and no disciplinary action was taken against any of the alleged harassers. *See* Perez 56.1 ¶ 32.

Perez claims that she subsequently complained to her superiors about incidents of perceived harassment, but that her complaints were met with indifference or hostile responses. *Seé* Perez Dep. at 131–32, 147, 249–51, 647, 655, 723, 740–41, 751–55. For example, Manager Frank Garafolo responded to Perez's complaints about Hartmann by telling her to "just get over it". *Id.* at 725. In 1999, Chaban responded to similar complaints by telling Perez to "cool down" because she had a "Latin temper". *Id.* at 249. In 1996, when Perez complained to Marshall, the then Technical Director, he responded: "If you don't like it, get another fucking job." Perez Aff. ¶ 8. Moreover, her requests to meet with her superiors Rick Post and Marshall in 1995, and Mary Beth Scalici in 2001, to discuss the perceived harassment were simply ignored. *See* Perez Dep. at 666; Perez Supp. Charge at ¶ 8; *see also* Email from Perez to Mary Beth Scalici, Ex. Z to McBrayer Aff.

On August 21, 1998, Perez filed a charge with the NYSDHR; she filed a Supplemental Charge on April 22, 1999. *See* Def.'s Perez 56.1 ¶ 36; Perez 56.1 ¶ 36; Ex. Q to Reynolds Aff. ("Perez Charge"); Perez Supp. Charge. These charges allege that Perez was discriminated against because of her national origin and her sex. *See generally* Perez Supp. Charge. The Supplemental Charge further alleges that Zeller's conduct reflected unlawful "Gender and Other Bias", and that she was deprived of benefits, training, and assignments that were given to white males and would have led to promotional opportunities. *Id.* ¶ 5.

On May 12, 2000, Perez filed her complaint in this action. *See* Complaint, Ex. C to Reynolds Aff. ("Perez Compl."). Her Complaint alleges: (1) sexual harassment, sex discrimination, and retaliation in violation of Title VII; (2) sex discrimination and retaliation in violation of the NYSHRL; (3) racial harassment, race discrimination, and retaliation in violation of Title VII; and (4) race discrimination and retaliation in violation of the NYSHRL. *See id.* ¶¶ 92, 96, 100, 104.

In December 2000, after filing this action, Perez received a permanent merit upgrade to the Group 7 pay scale. *See* Def.'s Perez 56.1 ¶ 29; Perez 56.1 ¶ 29. Perez has not yet received the increased compensation for Group 7. *See* Perez Dep. at 269.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the

governing law[,]'. [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must view the evidence "in the light most favorable" to the non-movant. *See Breland–Starling v. Disney Publ'g Worldwide*, 166 F.Supp.2d 826, 829 (S.D.N.Y.2001) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). A court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the nonmovant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable,

or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted).

## III. DISCUSSION

### A. Statute of Limitations

NBC claims that many of plaintiffs' Title VII and NYSDHR claims are time-barred. *See* Omnibus Memorandum of Law in Support of Defendant NBC's Motions for Summary Judgment ("Def. Omnibus Mem.") at 8–9.[26] Plaintiffs contend that the statute of limitations governing their claims should have been tolled because they suffered injuries that were part of a "continuing violation". *See* Plaintiffs' Memorandum of Law in Opposition to Defendant NBC's Motion for Summary Judgment ("Pl.Opp.") at 23–25.

#### 1. Legal Standard

In New York, Title VII claims must be filed with the EEOC or dual-filed with the NYSDHR within 300 days of the alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1). If a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred. *See Butts v. The City of New York Department of Hous. Preservation and Development*, 990 F.2d 1397, 1401 (2d Cir.1993). NYSHRL claims must be filed in court within three years of the alleged discriminatory act. *See* N.Y. Exec. Law § 297(9); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997). A claim is time-barred and must be dismissed if it was not filed in court within this time period. *See Strassberg v. Hilton Hotels Corp.*, No. 99 Civ. 0683, 1999 WL 605467, at *2 (S.D.N.Y. Aug.11, 1999),

---

**26.** Pursuant to the Court's instructions, NBC has submitted one Omnibus Memorandum of Law addressing common issues of law in the five lawsuits as well as five, shorter Memoranda of Law addressing the facts and legal is-

sues specific to each of the five cases. *See* 7/19/01 Transcript, Ex. A to Reynolds Aff. Plaintiffs submitted a Joint Memorandum of Law.

*aff'd*, 216 F.3d 1073, 2000 WL 949148 (2d Cir.2000), *cert. denied*, 531 U.S. 1055, 121 S.Ct. 664, 148 L.Ed.2d 566 (2000); *Patrowich v. Chemical Bank*, 98 A.D.2d 318, 470 N.Y.S.2d 599, 604 (1st Dep't 1984), *aff'd*, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984).

■ Pursuant to the "continuing violation" doctrine, a plaintiff may bring an otherwise time-barred discrimination claim where the alleged acts of discrimination occurred pursuant to an ongoing policy of discrimination. *See Annis v. County of Westchester*, 136 F.3d 239, 245–46 (2d Cir. 1998). "A continuing violation may be found where there is proof of specific ongoing discriminatory polices [sic] or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994). "Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period." *Id.*

■ "The courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of compelling circumstances." *Falinski v. Kuntz*, 38 F.Supp.2d 250, 257 (S.D.N.Y.1999) (quotation marks omitted); *see also Crosland v. The City of New York*, 140 F.Supp.2d 300, 307 (S.D.N.Y.2001); *Lloyd v. WABC–TV*, 879 F.Supp. 394, 399 (S.D.N.Y.1995). A continuing violation may not be premised on "discrete incidents of discrimination that are not related to discriminatory policies or mechanisms." *Falinski*, 38 F.Supp.2d at 257. Thus, "[c]ompleted acts such as a termination through discharge or resignation, a job transfer, or discontinuance of a particular job assignment, are not acts of a 'continuing' nature." *Malarkey v. Texaco*, 559 F.Supp. 117, 121 (S.D.N.Y.1982), *aff'd*, 704 F.2d 674 (2d Cir.1983) (per curiam). Nor can a continuing violation be established "merely because the claimant continues to feel the effects of a time-barred discriminatory act" or merely because the claimant continues his or her employment. *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.1999) (citing *Lightfoot*, 110 F.3d at 907 and *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). "Rather the claimant must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Id.*

■ When determining whether specific and related discriminatory acts constitute a discriminatory practice, a number of courts in this District have used the test articulated by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986). *See Draeger v. Bronx–Lebanon Hosp. Ctr.*, No. 98 Civ. 3688, 1999 WL 562103, at *4 (S.D.N.Y. Aug.2, 1999) (Baer, J.); *Simmons v. AT & T*, No. 96 Civ. 2844, 1998 WL 751659, at *5 (S.D.N.Y. Oct.28, 1998) (Bernikow, M.J.); *Dodson v. The New York Times Co.*, No. 97 Civ. 3838, 1998 WL 702277, at *3 (S.D.N.Y. Oct.7, 1998) (Preska, J.); *Brown v. Time, Inc.*, No. 95 Civ. 10081, 1997 WL 231143, at *5 (S.D.N.Y. May 7, 1997) (Mukasey, J.); *Davis v. City Univ. of New York*, No. 94 Civ. 7277, 1996 WL 243256, at *11 (S.D.N.Y. May 9, 1996) (Stein, J.); *McKenney v. Off–Track Betting Corp.*, 903 F.Supp. 619, 622 (S.D.N.Y.1995) (Kaplan, J.).

The *Berry* test focuses on three distinct issues. *First*, the test examines subject matter, asking if "the alleged acts involve the same type of discrimination, tending to

connect them in a continuing violation?" *Berry*, 715 F.2d at 981. *Second*, courts look at the frequency of the alleged acts, asking whether they are "recurring" or "more in the nature of an isolated work assignment or employment decision." *Id.* *Third*, courts consider the "degree of permanence." *Id.* The continuing violation doctrine, is less likely to apply when the time-barred acts "have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights." *Id.*

### 2. Analysis

#### a. Muro

█ Muro filed his NYSDHR Charge on August 21, 1998 and his Supplemental Charge on March 3, 1999. He filed his Complaint on August 3, 2000. Therefore, only incidents that occurred on or after October 25, 1997 are actionable under Title VII and only incidents that occurred on or after August 3, 1997 are actionable under the NYSHRL. All other claims, including his claim of race discrimination and retaliation based on his removal from "Today" on July 4, 1997, are time-barred and cannot be saved by the continuing violation doctrine.

█ First, Muro cannot establish that the time-barred incidents of alleged racial discrimination were part of a continuous practice and policy of discrimination. Muro's complaint alleges racially discriminatory acts by former·NBC manager Paul from 1986 through 1989 and then by a number of different NBC managers on different shows from 1997 through the date of his Complaint. The sole allegation of racial discrimination in the seven year period between 1989 and 1997 is that Accarrino mocked and mispronounced his name in an ethnically disparaging manner. As the Second Circuit has made clear, there is no "continuing violation" where

such a significant gap in time exists between time-barred acts of alleged discrimination and timely allegations. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998) (holding that gaps of one or more years between alleged incidents breaks the asserted continuum of discrimination and precludes finding a continuing violation); *Annis*, 36 F.3d at 251 (holding that six year gap precluded finding of continuing violation).

Nor can Muro establish that his allegations of hostile work environment constitute a continuing violation. A hostile work environment claim must meet the same requirements under the continuing violation doctrine as his other claims. *See Brennan v. Bally Total Fitness*, 153 F.Supp.2d 408, 413 (S.D.N.Y.2001) ("A claim of hostile work environment does not presuppose a continuing violation."); *see also Bampoe v. Coach Stores, Inc.*, 93 F.Supp.2d 360, 364 (S.D.N.Y.2000) ("hostile work environment claims fare no differently under 'continuing violation' analysis than do other claims grounded in Title VII."). Accordingly, the significant gap in time between Muro's hostile work environment allegations precludes finding a continuing violation. *See Quinn*, 159 F.3d at 766.

Muro attempts to compare his case to *Draeger*, where the district court found a continuing violation. *See* Pl. Opp. at 24. In *Draeger*, plaintiff alleged that a single supervisor subjected her to a "campaign of inappropriate comments and sexual harassment, as well as unwanted groping and grabbing" over an approximately seven year period. *Draeger*, 1999 WL 562103, at *4. Because plaintiff's time-barred allegations and her timely allegations "all involved the same type of discrimination" that "continued on a regular, almost daily basis" over the seven year period, the court found that defendant's

actions constituted a continuing violation. *Id.*

Muro's claims of a racially hostile work environment are dramatically different from those in *Draeger.* Muro's allegations involve different co-workers and supervisors, in different time periods and on different shows. These differences preclude invocation of the continuing violation doctrine.[27] *See Quinn,* 159 F.3d at 766 (events took place in different time periods); *Hill v. Taconic Development Disabilities Svcs. Office,* 181 F.Supp.2d. 303 (S.D.N.Y.2002) (holding that allegations of discrimination occurring while employee worked at one work site were not tied to discrimination that occurred two years later at another site)(no page numbers available); *Crosland,* 140 F.Supp.2d at 307 (holding that actions by different supervisors in different departments mitigates against finding a continuous violation).

Finally, Muro cannot demonstrate that the alleged acts of retaliation are part of a retaliatory policy or practice. "it is well-established that transfers, demotions, failure to compensate adequately, and failure to promote do not constitute a continuing violation." *Crosland,* 140 F.Supp.2d at 307 (citing cases). This is particularly true where, as here, many of the allegedly retaliatory acts were taken by persons in different departments. *Id.*

### b. Hogan

■ Hogan filed her Charge with the NYSDHR on October 29, 1999, and her Complaint on August 3, 2000. Therefore, only incidents that occurred on or after January 2, 1999, are actionable under Title VII and only incidents that occurred on or after August 3, 1997, are actionable under the NYSHRL. All other claims, including claims of retaliation by Accarino and Garofalo resulting from Hogan's 1995 complaint to an NBC Ombudsperson and claims of a sexually hostile work environment created by "Conan" Director Plonka, are time-barred.

Hogan's time-barred claims cannot be rescued by the continuing violation doctrine. First, Hogan cannot establish that the incidents of alleged discrimination were part of a continuous practice or policy of discrimination. Hogan's Complaint includes numerous instances of alleged disparate treatment beginning in 1987 and continuing to date. Throughout Hogan's tenure, she was supervised by nine different managers, on five different shows, while working in five different capacities, in two different facilities. This alone establishes that NBC's decisions concerning Hogan's career have been made independently by various supervisors from many departments. *See Crosland,* 140 F.Supp.2d at 307. Moreover, Hogan admits that she basically enjoyed working in Brooklyn for Mary Beth Scalici from 1996 through 1998. This gap in the alleged discrimination negates the finding of a continuing violation. *See Quinn,* 159 F.3d at 766; *Annis,* 36 F.3d at 251; *Hill,* 181 F.Supp.2d 303 (no page numbers available).

Nor can Hogan demonstrate that the alleged acts of retaliation by Accarino and Garofalo are part of a retaliatory policy or practice. "It is well-established that transfers, demotions, failure to compensate adequately, and failure to promote do not constitute a continuing violation." *Crosland,* 140 F.Supp.2d at 307 (citing cases). Because Hogan cannot establish a continu-

---

**27.** Moreover, *Draeger* was a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), not a motion for summary judgment. Thus, Muro must present facts that would support a finding of a continuing violation, while plaintiff in *Draeger* was only required to *allege* a continuing violation.

ing violation, her national origin and sex discrimination claims arising under the NYSHRL before August 3, 1997, are dismissed as are her Title VII claims arising before January 2, 1999.

#### c. Little

 Little filed his Charge with the NYSDHR on May 8, 1998 and his Supplemental Charges on March 2, 1999 and May 17, 1999. He filed his Complaint on May 12, 2000. Therefore, only incidents that occurred on or after July 12, 1997 are actionable under Title VII and only incidents that occurred on or after May 12, 1997 are actionable under the NYSHRL. The continuing violation doctrine will not save his time-barred claims because Little cannot show that NBC's alleged acts of discrimination constitute a discriminatory policy or practice.

Little's race discrimination claim is based on the following allegations: (1) a decrease in supervisory assignments between 1996 and 1999; (2) NBC's denial of Little's transfer request in 1996; (3) Little's exclusion from Graceland training in 1999; (4) NBC's denial of Little's request for a Group 7 position in the Videotape Operations department in August 1999; and (5) NBC's denial of his requests in 1999 and 2000 for an AVID editorial position. These incidents occurred over a period in which Little worked in a number of different departments under several different supervisors. This mitigates against invocation of the continuing violation doctrine. *See Crosland*, 140 F.Supp.2d at 307. Moreover, the fact that Little received various forms of training, merit upgrades and daily upgrades in this period indicates that there was no continuous practice of discrimination.

Like Muro, Little cannot rely on *Draeger* to argue that his hostile work environment allegations constitute a continuing violation. Little's hostile work environment claim is based on the following allegations: (1) Ku Klux Klan robes hanging on the front of a wardrobe rack in the exterior hallway at NBC's headquarters in June 2000; (2) display of a noose with the name of his African–American co-worker Joseph Meyer taped to it hanging in the second floor videotape maintenance shop in June 2001; and (3) disparate standards and discipline imposed on African–American employees. As discussed previously, this case is distinguishable from *Draeger* because the time-barred allegations and the timely allegations in *Draeger* "all involved the same type of discrimination" that "continued on a regular, almost daily basis" over the seven year period. 1999 WL 562103, at *4. There is no evidence here that the manner in which Scott allegedly treated African–American employees is related to the racially charged displays that Little observed in later years.

#### d. Rivera

 Rivera filed his NYSDHR Charge on April 17, 1998 and his Supplemental Affidavit on March 12, 1999. He filed his Complaint on May 12, 2000. Therefore, only incidents that occurred on or after June 21, 1997 are actionable under Title VII and only incidents that occurred on or after May 12, 1997 are actionable under the NHSHRL. While his retaliation claims arising prior to theses dates might be saved by the continuing violation doctrine, all other time-barred claims must be dismissed.

Rivera's claims that he has been harassed and subject to a hostile work environment over the past twenty years are based on specific comments made by various co-workers and supervisors, on different shows, at different times, that were not always directed at Rivera. The time gaps between the alleged incidents as well as

their different sources preclude invocation of the continuing violation doctrine. *See Quinn,* 159 F.3d at 766; *Annis,* 36 F.3d at 251; *Hill,* 181 F.Supp.2d 303 (no page numbers available); *Crosland,* 140 F.Supp.2d at 307. Nor can Rivera establish that NBC's denial of his requests for training and promotion every year since 1991 constitutes a policy or practice of discrimination. The fact that Rivera was promoted in 1989, 1991, and 1993, receiving training and pay increases along the way, breaks the continuum of alleged discrimination.[28] In addition, failures to promote do not constitute a continuing violation if, as here, there is no evidence that they are premised on a practice or policy of discrimination. *See Simpri v. New York City Agency for Children's Svces.,* No. 00 Civ. 6712, 2001 WL 1661910, at *4 (S.D.N.Y. Dec.28, 2001). This is particularly true here, because many of the allegedly discriminatory acts were committed by people in different departments.

■ Rivera, however, has proffered sufficient evidence to raise a genuine issue of material fact as to whether Scott's retaliatory actions constituted a continuing violation. Rivera charges that Scott retaliated against him for refusing to participate in Scott's allegedly racist "agenda" and for testifying to the NYSDHR in support of co-worker Giles' complaints in May 1996. The time-barred allegations of retaliation include: Scott's false accusations of drug abuse, order to take medical leave, and threats of termination in 1995; Scott's "physically menacing" behavior in June and November 1996; and Scott's involvement in Rivera's removal from an Olympics assignment in 1996. His timely allegations of retaliation include: Scott's

threatening responses to Rivera at a June 1997 Meeting regarding his assignment to "Conan"; Scott's assignment of Rivera to "Conan" in June 1997; and Scott's allegedly unfair issuance of a Final Letter of Warning to Rivera and docking his pay in February 1998. Examining the nature of the alleged retaliation, the frequency of the alleged acts, and their "degree of permanence", *Berry,* 715 F.2d at 981, I conclude that Rivera may be able to establish a continuing violation. *First,* Rivera's time-barred allegations include some of the same types of actions as the timely allegations—namely, threats from Scott and unfair disciplinary warnings. *Second,* the alleged retaliation occurred rather frequently. *Third,* the time-barred acts of alleged retaliation allegedly perpetrated by Scott were not so severe that one would necessarily have expected Rivera "to assert [his] rights" at that time. *Id.* Accordingly, Rivera's time-barred allegations of retaliation by Scott will not be dismissed on statute of limitations grounds.

### e. Perez

■ Perez filed her initial Charge with the NYSDHR on August 21, 1998. Accordingly, only incidents that occurred on or after October 25, 1997 are actionable under Title VII. Because Perez filed her Complaint on May 12, 2000, all of her NYSHRL claims before May 12, 1997 are time barred.

Perez's time-barred allegations of racial discrimination cannot be saved by the continuing violation doctrine because the alleged acts or comments were made by several different managers as well as a co-worker and occurred in distinct time-peri-

---

**28.** The frequency of NBC's denials of promotions of training were also due, in part, to Rivera's unrelenting requests for them. For example, when Rivera applied to Marzullo for an editing position, he "followed up" with Marzullo seventeen times. Rivera Dep. at 172, 181–82. Rivera also requested a promotion to Technical Director shortly after having been promoted to Supervisor. *See id.* at 71.

ods—1990, 1996, 1997, and 1999. *See Quinn*, 159 F.3d at 766; *Crosland*, 140 F.Supp.2d at 307. Nor can Perez establish that the time-barred incidents of sex discrimination were part of a continuous practice and policy. Each of Perez's allegations involves a denial of promotion or training, all of which are "[c]ompleted acts" that are not of a " 'continuing' nature." *Malarkey*, 559 F.Supp. at 121; *see also Crosland*, 140 F.Supp.2d at 307 ("[F]ailure to promote do[es] not constitute a continuing violation.").

Perez's time-barred allegations of retaliation also do not constitute a retaliatory policy or practice. *First*, Perez has presented no evidence that her assignment to low-level positions for eighteen months in response to her reporting the incidents on the "House Party" set is in any way related to the alleged retaliation for her complaints regarding events on the "Conan" set. *Second*, the alleged retaliatory harassment by her co-workers on "Conan" was perpetrated by a number of different people, which mitigates against a finding of a continuing violation. *See Crosland*, 140 F.Supp.2d at 307.

With respect to Perez's allegations of hostile work environment, only her allegations regarding Hartmann may constitute a continuing violation.[29] Perez's only allegation against Accarino is a single time-barred incident and the alleged acts by Zeller were isolated incidents separated by time gaps of two to three years. *See Harris*, 186 F.3d at 250 (stating that a plaintiff must allege some non time-barred act in order to prove continuing violation); *Quinn*, 159 F.3d at 766 (holding that gaps of one or more years between alleged incidents breaks the asserted continuum of discrimination and precludes a finding of continuing violation). Nor can her allegations of isolated incidents involving the

display and playback of sexually vulgar material by Chris Sieger, Jay Vicari, Alina Chaban, and other unnamed co-workers establish a continuing violation. *See Crosland*, 140 F.Supp.2d at 307 (holding that actions by different supervisors in different departments mitigates against finding a continuing violation).

Perez, however, has proffered sufficient evidence to raise a genuine issue of material fact as to whether Hartmann's conduct constituted a continuing violation. Her timely allegations with respect to Hartmann include: (1) Hartmann pushing Perez; (2) Hartmann physically preventing Perez from entering a room; (3) Hartmann's "Man Boy Love Association" comment to the NBC page within Perez's earshot; (4) Hartmann's comment that Zeller was a "prick" within Perez's earshot; and (5) Hartmann's refusal to take instructions from Perez on a number of occasions. The time-barred allegation include: (1) Hartmann nearly dropping a 75-pound monitor on Perez (2) Hartmann stating that "it smells like fish" when Perez was the only female in the vicinity; and (3) Hartmann refusing to take instructions from Perez. These time-barred and timely acts were recurring in nature and involved similar types of harassment, such as physical intimidation, comments of a sexual nature, and general hostility towards Perez's authority. *See Draeger*, 1999 WL 562103, at *4 (finding a continuing violation where allegations included frequent inappropriate comments and unwanted groping and grabbing before and after statute of limitations); *Dodson*, 1998 WL 702277, at *3 (finding that a continuing violation may exist where plaintiff's authority was repeatedly undermined before and after the statute of limitations). Furthermore, although Hartmann's time-barred acts were

---

**29.** As discussed *infra*, the *Faragher/Ellerth* defense is not available to NBC in this case.

ongoing, they were not so severe or permanent that one would have expected Perez to assert her rights on an earlier occasion. *See Berry,* 715 F.2d at 981 (holding that continuing violation doctrine is less likely to apply when time-barred acts "have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights"); *Riedinger v. D'Amicantino,* 974 F.Supp. 322, 326 (S.D.N.Y.1997) (stating that hostile environment harassment "will not have the same degree of permanence as a single incident, such as termination or the loss of a promotion, which should trigger an employee's duty to assert her rights."). Accordingly, Perez's time-barred hostile work environment allegations with respect to Hartmann will not be dismissed on summary judgment.

## B. Muro's Failure to Seek Leave to Amend His Complaint

■ NBC argues that Muro's sexual harassment/hostile work environment claims arising from his experience on "Conan" must be dismissed because they are only included in his Amended Complaint and Muro did not seek leave of this Court to amend his complaint. *See* NBC's Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Muro Mem.") at 8 n. 8. Pursuant to Rule 15(a), after the opposing party has submitted a responsive pleading, a plaintiff may only file an amended complaint "by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). The district courts have great discretion when deciding whether or not to grant leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Where a plaintiff has not requested leave to amend, some courts have held that the amended complaint is without legal effect and have refused to consider any new matters raised by it. *See, e.g., Murray v. Archam-*

*bo,* 132 F.3d 609, 612 (10th Cir.1998); *Hoover v. Blue Cross & Blue Shield,* 855 F.2d 1538, 1544 (11th Cir.1988); *In re Crazy Eddie Sec. Litig.,* 792 F.Supp. 197, 203–04 (E.D.N.Y.1992); *Gaumont v. Warner Bros. Pictures,* 2 F.R.D. 45 (S.D.N.Y.1941). In other cases, courts have agreed to consider an amended complaint served without judicial permission as long as the court would have granted leave to amend if it had been sought and none of the parties would be prejudiced by allowing the change. *See, e.g., American Angus Ass'n v. Sysco Corp.,* 865 F.Supp. 1174, 1175 (W.D.N.C.1993); *Hicks v. Resolution Trust Corp.,* 767 F.Supp. 167, 170 (N.D.Ill. 1991); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay, 6 Fed. Prac. & Proc. Civ.2d § 1484 (arguing that this rule "is in keeping with the overall liberal amendment policy of Rule 15(a) and the general desirability of minimizing needless formalities.").

■ "[J]ustice requires that a party be allowed to have all of its claims and defenses heard on the merits unless that party's failure to articulate the claim before the amendment harms the adverse party's ability to press its claims and defenses." *American Angus Ass'n,* 865 F.Supp. at 1175. NBC had prior notice of Muro's sexual harassment/hostile work environment claims because Muro raised them in his June 24, 1998 complaint to NBC's Ombudsperson and in his NYSDHR charges. Moreover, the fact that NBC did not protest Muro's amendment until nearly six months after service, when it filed its motion for summary judgment, indicates that any changes to the complaint did not take NBC by surprise. While these facts do not excuse Muro's failure to comply with the Federal Rules, justice requires that Muro be granted leave to amend his Complaint. According-

ly, Muro's Amended Complaint will be considered in this motion.

## C. Failure to Exhaust Administrative Remedies

NBC next argues that certain claims asserted by Muro, Hogan, Rivera and Perez must be dismissed because plaintiffs failed to exhaust their administrative remedies. *See* Def. Omnibus Mem. at 6. According to plaintiffs, any such claims should not be barred because they are sufficiently related to the claims asserted in their administrative charges.[30] *See* Pl. Opp. at 4–9.

### 1. Legal Standard

■ A plaintiff must exhaust administrative remedies before filing a Title VII action. *See Pauling v. Secretary of the Interior,* 160 F.3d 133, 134 (2d Cir.1998); *Connelly v. West,* No. 98 Civ. 6924, 2001 WL 102350, at *5 (S.D.N.Y. Feb.7, 2001). Failure to exhaust administrative remedies defeats the very purpose of the statutory notice provision, which is " 'to encourage settlement of discrimination disputes through conciliation and voluntary compliance.' " *Butts,* 990 F.2d at 1401 (quoting *Miller v. Int'l Tel. & Tel.,* 755 F.2d 20, 26 (2d Cir.1985)). Accordingly, courts in this district have often dismissed Title VII claims for failure to exhaust administrative

remedies. *See Connelly,* 2001 WL 102350, at *5 (citing cases).

■ Because Title VII's filing requirements are not jurisdictional prerequisites, however, they may be waived or tolled where equity requires. *See Snell,* 782 F.2d at 1101 (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 397–98, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)); *Adames v. Mitsubishi Bank Ltd.,* 751 F.Supp. 1565, 1570 (E.D.N.Y.1990). In *Butts,* the Second Circuit described three situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action. *First,* a claim in a judicial action may be "reasonably related" to a claim in an EEOC charge if the "conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' "[31] *Butts,* 990 F.2d at 1402 (quoting *Smith v. Am. President Lines, Ltd.,* 571 F.2d 102, 108 n. 10 (2d Cir.1978)). To determine if a claim meets this test, a court asks whether the allegations in the EEOC charge, as a whole, would reasonably lead the agency to investigate both grounds. *See Melendez v. Int'l Svc. Sys., Inc.,* No. 97 Civ. 8051, 1999 WL 187071, at *6 (S.D.N.Y. Apr.6, 1999)("[T]he court should not look merely

---

**30.** Plaintiffs also argue that this Court should permit their claims under the "single filing" rule. *See* Pl. Opp. at 9–10. This rule permits an employee that has not filed with the EEOC to assert discrimination claims by piggybacking on a suit that has been brought by a co-worker that did fulfill the EEOC's filing requirements. *See Snell v. Suffolk County,* 782 F.2d 1094, 1101 (2d Cir.1986). Specifically, "where one plaintiff has filed a timely EEOC complaint [that went unaddressed by the employer], other non-filing plaintiffs may join in the action if their individual claims 'aris[e] out of similar discriminatory treatment in the same time frame.' " *Id.* at 1100 (quoting *Ezell v. Mobile Hous. Bd.,* 709 F.2d 1376,

1381 (11th Cir.1983)). However, in Title VII actions, the "single filing rule" only permits non-filing plaintiffs to join a previously commenced Title VII action. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052, 1057 (2d Cir.1990). The rule does not permit non-filing Title VII plaintiffs to initiate their own actions, as plaintiffs have done here. *See id.*

**31.** This type of "reasonably related" claim is "essentially an allowance of loose pleading" that is permitted because, in most Title VII cases, the EEOC charges are filed without the aid of an attorney. *Butts,* 990 F.2d at 1402.

to the four corners of the often inarticulately framed charge." (quotation marks omitted)); *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F.Supp.2d 455, 458 (S.D.N.Y.1998) ("[I]t is the substance of the charge and not its label that controls."). *Second*, a claim is "reasonably related" to an EEOC charge if plaintiff alleges incidents of discrimination that were carried out in the same manner as those alleged in the charge. *See Butts*, 990 F.2d at 1402–03. *Third*, an employee's claim of employer retaliation for filing an EEOC charge is deemed "reasonably related" to that charge. *See id.* at 1402.

### 2. Analysis

#### a. Muro

■■■ NBC insists that Muro's claim of a racially hostile work environment must be dismissed because he failed to explicitly raise this claim in his NYSDHR charges. *See* Def. Muro Mem. at 4. This claim, however, is "based on the same type of discrimination" as the discrimination and retaliation charges in Muro's NYSDHR charges, *i.e.*, discrimination based on race. *Commer v. City of New York*, No. 93 Civ. 7408, 1996 WL 374149, at *2 (S.D.N.Y. July 3, 1996), *aff'd*, 125 F.3d 843, 1997 WL 589888 (2d Cir.1997)(citing *Peterson v. Insur. Co. of North Am.*, 884 F.Supp. 107 (S.D.N.Y.1995); *Staples v. Avis Rent–A–Car Sys.*, 537 F.Supp. 1215 (W.D.N.Y.

1982)). Moreover, Muro's complaint to the Ombudsperson, which was attached to his Supplemental Charge, complains of a "work environment" that "repeatedly rel[ies] on humiliation and power acts by positional authorities as a normal operating procedure." [32] *Id.* at *4. This accusation, combined with Muro's charges of racial discrimination and retaliation, should have reasonably led the EEOC to investigate Muro's hostile work environment claim.[33] *See Connelly*, 2001 WL 102350, at *5 (holding that, where plaintiff's charge included a claim for discriminatory termination based on national origin, the EEOC investigation would reasonably be expected to investigate claims of national origin harassment preceeding that termination).

#### b. Hogan

■■■ NBC claims that Hogan's hostile work environment claims must be dismissed for failure to exhaust administrative remedies. Hogan's Complaint alleges that NBC "has created and maintained a workplace permeated with discriminatory intimidation and sexual harassment that has been and continues to be both severe and pervasive enough to alter the conditions of Plaintiff's employment." Hogan Compl. ¶ 27. Construing this general allegation to Hogan's benefit, she has alleged the following two sexually hostile work environments: (1) the hostile work environment created by Plonka on the "Conan"

---

32. "[I]n determining the scope of the investigation that can reasonably be expected, the court must consider any attachments that a complainant has submitted with his EEOC complaint." *Commer*, 1996 WL 374149, at *2; *see also Minetos v. City Univ.*, 875 F.Supp. 1046, 1052 (S.D.N.Y.1995) (allegations of age discrimination made in a type-written statement attached to an EEOC complaint held sufficient to alert the EEOC to possible age discrimination claim even though no age discrimination claim was filed with the EEOC).

33. NBC cites *Brown v. Coach Stores, Inc.*, No. 99 Civ. 10797, 2000 WL 1239113, at *2 (S.D.N.Y. Aug.31, 2000) and *Ghose v. Century 21, Inc.*, 108 F.Supp.2d 373 (S.D.N.Y.2000) for the proposition that "claims for harassment do not fall within the scope of a reasonable investigation of a discriminatory treatment claim." Def. Omnibus Mem. at 3–4. There is no such general rule. *Brown* and *Ghose* merely held that the administrative charges in those particular cases would not have led the EEOC to investigate claims of hostile work environment.

set; and (2) the hostile work environment Hogan presently endures on "The Today Show." As stated earlier, any claims resulting from Hogan's experience while working on "Conan" are time-barred.

Hogan's claims of hostile work environment on "The Today Show" also must be dismissed because she failed to include any allegations of hostile work environment or other sexual harassment in her NYSDHR Charge. Hogan's Charge states that she has "been demoted, denied upgrades and overtime, and [has] suffered diminished opportunities for professional growth." Hogan Charge. While Hogan does include the word "harassment," that word is used in connection with her retaliation claim. Moreover, the examples of the ongoing discrimination and retaliation provided in Hogan's Summary of Charges only speak of inferior assignments, demotions, unfair discipline and disparate pay. Nowhere does the Charge or Summary of Charges mention a hostile work environment or specific instances of sexual harassment. In fact, Hogan did not begin working for "The Today Show" until after her Charge was filed on October 29, 1999. Under these circumstances, Hogan's hostile work environment claims cannot be deemed reasonably related to the claims contained in her NYSDHR Charge and are dismissed for failure to exhaust administrative remedies. *See Connelly*, 2001 WL 102350, at *5.

### c. Rivera

 NBC argues that Rivera's race discrimination and racial harassment claims must be dismissed because they were not raised in his Charge or Supple-

mental Affidavit with the NYSDHR. The only claim Rivera raised in his Charge was retaliation for his testimony in a co-worker's discrimination case and the "actions or practices" listed in his Charge are not racial.[34] There are no descriptions of racial harassment or racial discrimination and, in fact, no mention of race at all. *See Khamba v. SSEU Local 371*, No. 97 Civ. 4461, 1999 WL 58924, at *3 (S.D.N.Y. Feb.5, 1999) (holding that national origin discrimination claim was not reasonably related to retaliation claim because "[n]owhere in [plaintiff's] EEOC charge ... does [he] suggest that [defendant's] decision was based on his national origin."). Because the facts included in Rivera's Charge would not lead to an investigation into possible race discrimination and racial harassment, Rivera has failed to exhaust his administrative remedies with respect to these claims. Accordingly, they are dismissed.

### d. Perez

 NBC argues that Perez has not exhausted her administrative remedies with respect to her race harassment claim. *See* Def.'s Perez Mem. at 4. Perez's Charge does not explicitly allege racial harassment or mention any racially harassing comments or incidents. *See generally*, Perez Supp. Charge. Nor is Perez's race harassment claim "reasonably related" to her claims of race discrimination and sexual harassment. Her Charge claims that NBC "fosters an atmosphere of disparate and discriminatory treatment," alleges that white males with poor performance records were given upgrades that

---

**34.** The retaliatory action listed are: (1) his name was "mysteriously" removed from the Desk Supervisor schedule; (2) he was not assigned to work on the 1996 Olympics; (3) he was "stalked" by Scott; (4) he was assigned to "Conan"; (5) he was "ordered to perform a job for which [he] was not qualified;" and (6) he was subject to various rumors and accusations of absenteeism. 4/17/98 Charge, Ex. R to Reynolds Aff. ¶¶ 3(a)-(i).

she was denied, and claims that white males with poor performance records were not disciplined. *Id.* ¶ 20. Because these allegations would not reasonably lead the EEOC to investigate racial harassment, Perez has failed to exhaust her remedies with respect to this claim. *See Butts,* 990 F.2d at 1402; *Eaton v. American Media Operations Inc.,* No. 96 Civ. 6158, 1997 WL 7670, at *2 (S.D.N.Y. Jan.9, 1997) (holding that court did not have jurisdiction over sexual harassment claim where EEOC charge only alleged sex and national origin discrimination and no specific instances of sexual harassment); *Torriero v. Olin Corp.,* 684 F.Supp. 1165, 1170 (S.D.N.Y.1988) (same). Accordingly, Perez's race harassment claim is dismissed.

## D. Discrimination Claims

### 1. Legal Standard

 Title VII makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e–2. New York's Human Rights Law ("NYHRL") makes it an "unlawful discriminatory practice" for an employer

> . . . because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to

discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. N.Y. Exec. Law. § 296(1)(a). In this Circuit, courts analyze discrimination claims brought under Title VII and the NYHRL in the same manner. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000).

Where there is no direct evidence of discrimination, *i.e.,* only indirect or circumstantial evidence, a plaintiff establishes a prima facie case of discrimination by showing: (1) he or she is within a protected group; (2) he or she is qualified for the position; (3) he or she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected group.[35] *See Bazile v. New York Hous. Auth.,* No. 00 Civ. 7215, 2002 WL 171690, at *9 (S.D.N.Y. Feb.1, 2002). "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). If the defendant meets this burden of production, "the presumption drops out of the analysis," and the plaintiff must prove that he or she was actually the victim of intentional discrimination. *Id.*

 Here, NBC claims that Hogan cannot meet the second prong of the prima facie case and that all plaintiffs fail to meet the third and/or fourth prongs.[36] *See* Def.

---

**35.** Where plaintiffs offer direct evidence of discrimination, they may proceed under the "mixed motive theory" established in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 241–42, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *Tappe v. Alliance Capital Mgmt.,* 198

F.Supp.2d 368, 372–74 (S.D.N.Y. 2001)("*Tappe II*").

**36.** NBC concedes that all plaintiffs are members of a protected class. *See* Def. Mem. at 13–14.

Omnibus Mem. at 14 & n. 1. To prove the second prong—qualification—plaintiff must show that his or her performance was of "sufficient quality to merit continued employment." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.1978). Plaintiff's job performance need only be "satisfactory," *Thornley v. Penton Publ'g*, 104 F.3d 26, 30 (2d Cir.1997), not "flawless," *Powell*, 580 F.2d at 1155. While "satisfactory" is defined in terms of "the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or the judge," *Thornley*, 104 F.3d at 30, proof that plaintiff did not receive negative feedback can raise "[a]n inference of satisfactory performance," *Pimentel v. The City of New York*, No. 00 Civ. 0326, 2001 WL 1579553, at *3 (S.D.N.Y. Dec.11, 2001)(citing *e.g., Powell*, 580 F.2d at 1155).

 The third prong—an adverse employment action—requires plaintiff to show that he or she was subject to a "materially adverse change" in the terms and conditions of employment. *Galabya v. N.Y. City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir.2000); *see also Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997). While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify: discharge or demotion, *see, e.g., Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230, 1999 WL 9843, at *8 (S.D.N.Y. Jan.11, 1999); *Penny v. Winthrop–Univ. Hosp.*, 883 F.Supp. 839, 845 (E.D.N.Y.1995); denial of a provisional or permanent promotion, *see, e.g., Dollinger v. State Insur. Fund*, 44 F.Supp.2d 467, 482 (N.D.N.Y.1999); addition of responsibilities, *see Dollinger*, 44 F.Supp.2d at 482 (citing *Simmerman v. Hardee's Food Sys., Inc.*, No. Civ. A. 94–6906, 1996 WL 131948, at *14 (E.D.Pa. Mar.22, 1996), *aff'd*, 118 F.3d 1578 (3d Cir.1997)); involuntary transfer that entails objectively inferior working conditions, *see Patrolmen's Benev. Ass'n of City of New York, Inc. v. City of New York*, 74 F.Supp.2d 321, 336 (S.D.N.Y.1999); denial of benefits, *see Dollinger*, 44 F.Supp.2d at 482; denial of a requested employment accommodation, *see Pomilio*, 1999 WL 9843, at *8 n. 7; denial of training that may lead to promotional opportunities, *Ewing v. Coca Cola Bottling Co. of New York, Inc.*, No. 00 Civ. 7020, 2001 WL 767070, at *8 (S.D.N.Y. June 25, 2001); and a shift assignment that makes a normal life difficult for the employee, *see Gibson v. American Broadcasting Co.'s, Inc.*, 892 F.2d 1128, 1134 (2d Cir.1989) (assignment to a shift with no weekends off for 28 months).

 The facts required to meet the fourth prong—an inference of discrimination—will "necessarily vary in different employment discrimination cases." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001). While a showing that similarly situated employees outside of plaintiff's protected class received different treatment is " 'a common and especially effective method' " of raising such an inference, "it is not sufficient in all situations." *Tappe v. Alliance Capital Mgmt., L.P.*, 177 F.Supp.2d 176, 185 (S.D.N.Y.2001)("*Tappe I*")(quoting *McGuinness*, 263 F.3d at 53). Nor is it the only way to discharge this burden. *See Tappe II*, 198 F.Supp.2d at 375–76. For example, discriminatory intent may be inferred from criticism of plaintiff's performance in invidious or ethnically degrading terms, invidious comments about others in plaintiff's protected group, or the sequence of events leading to the negative employment action. *See Pimentel*, 2001 WL 1579553, at *4–*5 (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37, 38 (2d Cir.1994)). "Actions taken by an employer that disadvantage an employee for no logical reason" may also

constitute "strong evidence of intent to discriminate." *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 880 n. 6 (2d Cir.1997). Finally, the Second Circuit recently held that "[s]howing the employer's proffered legitimate explanation for termination is not worthy of belief is 'one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.' " *Windham v. Time Warner, Inc.*, 275 F.3d 179, 180 (2d Cir.2001)(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

### 2. Analysis [37]

#### a. Muro

NBC contends that Muro's race discrimination claims must be dismissed because he cannot establish that he was subject to "an adverse employment action" or that any adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See* Def. Muro Mem. at 6. To assess NBC's argument, it is necessary to separately examine each alleged basis for Muro's race discrimination claim: (1) his experience on "Conan"; (2) his removal from "Conan"; (3) Miller's request that he be removed from "Rosie"; and (4) his subsequent assignment to weekend and late night shifts.

■ Muro claims that, when he worked on "Conan", Plonka subjected him to harsher scrutiny and held him to a higher

standard than Caucasian crew members. This allegation is insufficient, as a matter of law, to sustain a claim of race discrimination. First, the stringent treatment Muro complains of—not being permitted to arrive late, to prop his feet up, or to read books or do bills during production—does not rise to the level of an adverse employment action that "materially affects" the conditions of Muro's employment. *See* Muro Dep. at 184–86, 202–03, 215. Moreover, Muro has produced no evidence from which to infer that this disparate treatment was based on his race. While proof that similarly situated Caucasian employees received different treatment would raise such an inference, *see Tappe I*, 177 F.Supp.2d at 185, Muro has not shown that he was treated differently than "similarly situated" crew members. Because Muro was the supervisor of the other crew members, it was reasonable to hold him to a higher standard than that applied to his co-workers. *See Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 839 (2d Cir.1996) ("Requiring higher-ups to conform to a higher standard of decency is not contrary to established law and does conform with common sense.").

■ Nor can Muro sustain a claim of discrimination based on Plonka's request that he be removed from "Conan". Even if removal from "Conan" constitutes an adverse employment action, Muro has produced no evidence suggesting that Plonka's request was racially motivated.[38]

■ Muro's race discrimination claim based on his removal from "Rosie" also fails as a matter of law, for he has failed to

---

**37.** As noted earlier, Rivera's discrimination claim is dismissed for failure to exhaust administrative remedies.

**38.** Muro argues that Plonka gave preferential treatment to Causcian male crew-members

who responded to flirting. His admission that she also made sexual advances towards him shows that any differential treatment he received was not *because of his race*.

produce any evidence that would suggest that Miller's request for his removal was based on race. In any event, NBC has met its burden of establishing a non-discriminatory reason for Muro's removal from "Rosie"—namely, that Miller was unhappy with his performance. Muro admits that Miller expressed her dissatisfaction with his performance, *see* Muro Dep. at 511–13; Muro 56.1 ¶ 26, and he has raised no genuine issue of fact as to whether this explanation was merely a pretext for discrimination.

 Muro has, however, produced sufficient evidence to defeat summary judgment with respect to his claim of race discrimination based on his recent assignment to late night and weekend shift work. Contrary to NBC's contention, there is a genuine issue of material fact as to whether Muro was subject to an adverse employment action. While it is undisputed that Muro has remained at the Group 8 pay level, Muro has produced evidence that he incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule. This evidence, if true, could prove that Muro was subject to an adverse employment action.[39] *See Gibson,* 892 F.2d at 1134 (shift to assignment with undesirable schedule may constitute adverse employment action); *Patrolmen's Benev. Ass'n of City of New York,* 74 F.Supp.2d at 336 (involuntary transfer that entails objectively inferior working conditions may constitute adverse employment action).

In addition, Muro has produced sufficient evidence to raise an inference of discrimination on the part of Accarrino, who was ultimately responsible for these assignments. Muro testified that Accarrino engaged in mocking, racially offensive conduct until 1998, when Muro filed his complaint with the EEOC. Such evidence, even if it occurred well before the statute of limitations, may support an inference of racially discriminatory intent. *See Mullen v. Princess Anne Volunteer Fire Co.,* 853 F.2d 1130, 1133 (4th Cir.1988) ("Use of racial aspersions obviously provides an indication that the speaker might be more likely to take race into account in making a hiring or membership decision."); *Eaton,* 1997 WL 7670, at *5 (holding that past acts of harassment by president of company, though time-barred, may show bias and thus support an inference of discriminatory intent). Furthermore, the fact that Accarrino ignored Muro's earlier complaints of discrimination may suggest a discriminatory motivation. *See Cornwell,* 23 F.3d at 707 (trial court's finding of employers' discriminatory treatment not clearly erroneous where plaintiff produced evidence that her superiors failed to respond to her complaints of harassing conduct).

### b. Hogan

 Hogan complains that, throughout her employment at NBC, she has made repeated requests to be permanently upgraded. Despite these requests, Hogan has consistently remained at the Group 2

---

**39.** Muro cannot, however, base his discrimination claim on NBC's alleged failure to promote him to a Director position. In order to assert a failure to promote claim a plaintiff must identify a specific position for which he applied and was rejected. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir. 1998); *Campbell,* 107 F.Supp.2d at 242. Muro admits that he has not specifically approached anyone regarding promotion to a Director position since he was removed from the "Today" show in July 1997. *See* Muro 56.1 ¶ 34. While he claims that he "clearly expressed his goal of working as a director" throughout his career at NBC, *id.,* such vague indications of interest do not satisfy the requirements of a failure to promote claim.

pay level, while her white male colleagues are often paid at higher levels. *See* Hogan Compl. ¶ 76. In a similar vein, Hogan alleges that her white male colleagues with less experience than she regularly receive merit upgrades. *See id.* ¶ 77. She claims that she has consistently been denied the opportunity to receive the training needed to qualify for merit upgrades, training which is routinely given to white male employees at NBC. *See id.* ¶ 79. Hogan also claims that she has been consistently overlooked for high-profile assignments which are routinely given to white males. *See id.* ¶ 78.

NBC argues that Hogan has failed to establish a prima facie case of discrimination because she was not qualified for a number of the positions she held due to her frequent lateness and poor performance. While it is true that Hogan did receive some disciplinary warnings, they were sporadic in nature and do not indicate an overall inability on Hogan's part to perform her job responsibilities. Hogan also received a number of positive performance reviews. Furthermore, seemingly dispositive of Hogan's qualifications is the fact that she has been, and continues to be, employed by NBC for over eighteen years. *See Powell,* 580 F.2d at 1155 (to prove qualification prong, plaintiff must show that her performance was of "sufficient quality to merit continued employment"). Accordingly, Hogan has satisfied the first two prongs of a prima facie case of discrimination—namely, that she is a member of a protected class and is qualified for the position she holds.

NBC disputes Hogan's claim of discriminatory pay differential on the "Later Today" show, arguing that there was only one Audio Mixer position which was filled by two highly skilled male mixers, Steve Singer and Jeff Wright. According to NBC, once the show was up and running, Singer was reassigned and Wright remained as the sole Audio Mixer. Hence, Hogan did not replace Singer and her position was not downgraded from a Group 7 to a Group 2. Despite these contentions, whether Hogan replaced Singer in an Audio Transmission capacity is a disputed issue of fact. *See* Hogan Dep. at 517 ("Sometimes [Singer] assumed the mixing position and other days he assumed the audio transmission position."). This issue cannot be resolved as a matter of law and is best left for a jury to decide.

NBC argues that Hogan's claim that she was unfairly denied merit upgrades fails because she has not offered any evidence that such denials were because of her national origin or sex. In support thereof, NBC argues that the four engineers to whom Hogan compares herself are Daily Hires and, therefore, not valid comparators. While this may be true, Hogan has alleged a history of being underpaid compared to her white male colleagues beginning with her position on "Another World" and the "Later Today" show, and continuing through her current work on "The Today Show" and "Weekend Today." Whether Hogan's white male colleagues who were, and are, allegedly paid more than her are similarly situated is a question of fact that cannot be resolved on summary judgment. The fact that Hogan, a Puerto Rican woman, was paid less than white male NBC employees in almost every position she held raises an inference of national origin and sex discrimination, regardless of the employees' titles. Moreover, the fact that Hogan has remained at a Group 2 pay scale for the duration of her lengthy career at NBC may be circumstantial evidence that she has been the victim of discrimination. Because Hogan has met the requirements of a prima facie case of discrimination with regard to compensation, her pay differential claims cannot be dismissed on summary judgment.

Finally, NBC argues that Hogan's reassignments to various shows are not cognizable adverse employment actions. This argument overlooks Hogan's allegations of being unfairly denied a position on "The Today Show" concert series by the Scheduling Coordinator, Julie Radin. The discriminatory denial of a high-profile assignment may, in certain circumstances, constitute an adverse employment action. In addition, the fact that a member of a plaintiff's protected class was responsible for the discrimination does not necessarily defeat a discrimination claim. *See Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that same-sex sexual harassment is actionable under Title VII). Accordingly, Hogan's claim based on denial of favorable assignments also survives.

In sum, Hogan has produced some evidence that she has been, and continues to be, paid less than her white male counterparts. Her claims of disparate treatment with regard to pay differences and work assignments raise genuine issues of material fact that cannot be resolved on summary judgment.[40] Accordingly, NBC's motion to dismiss Hogan's disparate treatment claims with regard to her compensation and the denial of high-profile assignments is denied.

### c. Little

■ NBC contends that Little's race discrimination claims must be dismissed because he cannot establish that: (1) he was qualified for some of the positions he sought; (2) he was subject to any adverse employment action; and (3) any adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See* Def. Mem. at 4.

Little has produced sufficient evidence to support a claim of race discrimination based on the reduced number of supervisory ARPS assignments he received while under Scott's supervision. Because Little had periodically worked as an ARPS supervisor since 1993, he has offered sufficient evidence that he is qualified for the daily assignment upgrade. In addition, there is a genuine issue of material fact as to whether the decrease in the number and frequency of daily upgrades received by Little resulted in an actual loss in income, which would constitute an adverse employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Finally, there is a genuine issue of material fact as to whether similarly situated Caucasian employees received daily upgrades which Little was denied. This fact, if established, could give rise to an inference of discrimination. *See Tappe I*, 177 F.Supp.2d at 185.

Little has also produced sufficient evidence to defeat summary judgment on his race discrimination claim based on exclusion from Graceland training in 1999. The fact that nearly all Caucasians who had worked in ARPS went on to work in Graceland suggests that Little may have been qualified to train in the new technology. Because this training would have resulted in greater job security and more overtime hours, the denial of such training may constitute an adverse employment action. *See Ewing*, 2001 WL 767070, at *6. Finally, Little has produced evidence that all of his Caucasian counterparts received Graceland training. This fact, if established, could give rise to an inference of discrimination. *See Tappe I*, 177 F.Supp.2d at 185.

---

**40.** Hogan's claim that she was unfairly denied the training necessary to qualify for merit upgrades can be dismissed, however, as there is absolutely no evidence in the record that Hogan was denied training because she is Puerto Rican or a woman.

██ Little's discrimination claims based on NBC's denial of (1) his request to work as an AVID editor, (2) his request for a Group 7 position in the Videotape Operations department, (3) his request to work with the Olympics, and (4) his repeated requests for a work schedule that would allow him to comply with his child custody obligations, all fail as a matter of law because Little has failed to produce evidence that these actions occurred under circumstances giving rise to an inference of discrimination. With respect to the AVID editorial position, Little points to the fact that the position was filled by a Caucasian man. He admits, however, that he knows nothing about that individual's prior work experience, such as whether or not the individual had any editing experience. Because there is no evidence that this individual was similarly situated to Little, the mere fact that he was Caucasian cannot give rise to an inference of racial discrimination. With respect to the denial of the Group 7 position and the Olympics position, not only has Little produced no evidence that the denial was based on race, but he has actually admitted that the individual who obtained the Group 7 position had worked at NBC longer than he and that he knows nothing about that individual's prior work experience. *See* Little Dep. at 206–07. Finally, Little admits that minority employees have received the type of schedule modification that he claims to have been denied because of his race, and has failed to produce any other evidence suggesting racial motivation.

### d. Perez

NBC contends that Perez's race and sex discrimination claims must be dismissed because she cannot establish that she was subject to an "adverse employment action" or that any adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See* Def. Perez Mem. at 5. Perez's race and sex discrimination claims are based on the following allegations: (1) NBC's refusal to give her "high profile" assignments; (2) NBC's denial of her requests for training; (3) Accarino's failure to award her a PSC; and (4) NBC's failure to award her a permanent merit upgrade.

██ Perez claims that throughout her career, NBC has given preferential treatment to white males when assigning personnel to "high profile" events.[41] Her only timely allegations is her contention that NBC assigned her to a "less prestigious" position during the 2000 Olympics that paid fewer overtime hours. *See* Perez Dep. at 210, 213–4. Perez's normal job duties did not include the opportunity to receive assignments other than those as Music Mixer. The mere fact that NBC sometimes offered her such opportunities does not make such assignments a "term or condition" of her employment. Therefore, the denial of the position she desired at the 2000 Olympics did not effect the "terms and conditions" of her employment and did not constitute an adverse employment action. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 588 (11th Cir.2000)(finding no adverse employment action where professor plaintiff was not "entitled to or particularly deserving" of teaching a requested class); *Ruggieri v. Harrington*, 146 F.Supp.2d 202, 217 (E.D.N.Y.2001)(holding that denial of opportunity that plaintiff was not entitled to in the first place was not an adverse employment action). Accordingly, this denial

---

**41.** These "high profile" events include NBC's broadcasts of the Olympics in Sydney and Atlanta, the Macy's Thanksgiving Day Parade, and the Rockefeller Center Tree Lighting Ceremony. *See* Perez Supp. Charge. ¶¶ 3, 12, 13, 14, 15

cannot serve as a basis for her claim of sex or race discrimination.

Nor can Perez sustain a claim of discrimination based on the denial of requests for training. Her only timely allegation is that she was only permitted to train on a new console in the "Conan" control room if she simultaneously performed another position for the 2000 Olympics. *See* Perez Dep. at 212–213. Perez has not presented evidence that other similarly situated employees were given better training. The mere fact that she did not receive the training at the exact time or in the manner she desired does not give rise to an inference of sexual or racial animus. *See Campbell*, 107 F.Supp.2d at 245–46 (dismissing failure to train claim because no inference of animus could be made where plaintiff received training, albeit not to the extent or in the manner she desired).

Similarly, Perez has not alleged sufficient facts to infer that Accarino denied her many requests for a PSC for discriminatory reasons. Perez has presented no evidence that any Music Mixer has received a PSC, *see* Perez Dep. at 287–89, and NBC *has* presented evidence that no other Music Mixer has received a PSC. *See* Scalici Aff. ¶ 13. Thus, she cannot maintain a discrimination claim based on this allegation.

▪ To the extent that Perez's discrimination claim is based on the denial of a permanent upgrade, however, she has produced sufficient evidence to infer discrimination and defeat summary judgment.[42] *First,* Perez has proffered evidence that white male Music Mixers and white males who sometimes perform Music Mixer duties were placed in higher merit groups despite the fact that they had less experience. *See Tappe I,* 177 F.Supp.2d at 185 (evidence that plaintiff was treated differently than similarly situated employees outside of plaintiff's protected class may raise an inference of discrimination). *Second,* because Perez has presented evidence that she was an excellent Music Mixer who was recognized in her trade, NBC's failure to offer any explanation as to why she was not given a merit upgrade may give rise to an inference of discrimination. *See Stratton,* 132 F.3d at 880 n. 6 (stating that "[a]ctions taken by an employer that disadvantage the employee for no logical reason" may constitute "strong evidence of intent to discriminate."). Finally, Perez's receipt of a merit upgrade *after* she commenced this litigation may raise a material issue of fact as to why she was not given the promotion at an earlier date. *See Polley v. Federal Reserve Bank,* No. 92 Civ. 7114, 1994 WL 465923, at *6 (S.D.N.Y. Aug.23, 1994) (finding that there was an issue of material fact as to whether plaintiff was subject to discrimination where plaintiff was only promoted after she filed an internal complaint).

## E. Retaliation Claims

### 1. Legal Standard

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Under New York law, it is unlawful for any employer "to discharge, expel or otherwise

---

42. NBC does not contest that the denial of a permanent merit upgrade is an "adverse employment action". Because a merit upgrade only involves a pay raise rather than a change in position, I will not consider this as a failure to promote claim. *See Brown,* 163 F.3d at 709 (stating that elements of failure to promote claim include applying for a position and being rejected for the position).

discriminate against any person because he or she has opposed any [unlawful discriminatory practice] or because he or she has filed a complaint, testified or assisted in any proceeding" relating to an unlawful discriminatory practice. N.Y. Exec. Law. § 296(1)(f). The primary purpose of these provisions is to prohibit employers from retaliating against employees because they complain of prohibited workplace discrimination. *See Pimentel*, 2001 WL 1579553, at *16.

To establish a prima facie case of retaliation a plaintiff must establish that: (1) he or she engaged in a statutorily protected activity; (2) the defendant was aware of plaintiff's participation in the protected activity; (3) the defendant took an adverse employment action against plaintiff; and (4) a causal connection existed between the protected activity and the adverse employment action. *See McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). A retaliation claim follows the same burden shifting framework as a discrimination claim. *See Richardson v. New York State Dept. of Correctional Svc.*, 180 F.3d 426 (2d Cir.1999) (Title VII retaliation claim); *Cruse v. G & J USA Publ'g*, 96 F.Supp.2d 320, 327 (S.D.N.Y. 2000) (N.Y.SHRL retaliation claim).

Here, NBC contends that certain plaintiffs cannot satisfy the second, third and fourth elements of the prima facie case. *See* Def. Omnibus Mem. at 18; Def. Muro Mem. at 7. As for the first element, "protected activity" often takes the form of filing a lawsuit or formal complaint with an agency. *See Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir.1992). However, "it may also take the form of less formal protests, such as making complaints to management, writing critical letters to customers, or expressing support of co-workers who have filed charges." *Del Castillo*

*v. Pathmark Stores*, 941 F.Supp. 437, 438–439 (S.D.N.Y.1996). Plaintiffs must also demonstrate that NBC was aware that they had engaged in protected activity. Defendants must have "knowledge" of the protected activity to be able to "engage in retaliation." *Gordon v. Kings County Hosp. Ctr.*, 95–CV–3006, 2000 WL 1868091, at *6 (E.D.N.Y. Oct.25, 2000); *see also Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 242 (S.D.N.Y.1998) (holding that, if defendant was unaware of plaintiff's activity, defendant's actions "could not have been motivated by the fact that" plaintiff engaged in the activity). This knowledge cannot be shown by "inferences alone." *Gordon*, 2000 WL 1868091, at *6.

As discussed earlier, there is no exhaustive list of what constitutes an adverse employment action. Courts have held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions.

Still, plaintiffs must demonstrate the fourth element—a causal connection between these adverse employment actions and their statutorily protected activity. *See McMenemy*, 241 F.3d at 282–83. There are several ways by which a plaintiff may establish this causal connection. A plaintiff may do so "indirectly," by showing that "the protected activity was followed closely by discriminatory treatment." *Rodriguez v. Beechmont Bus Svc., Inc.*, 173 F.Supp.2d 139, 150 (S.D.N.Y.2001) (citing *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)). Although there is no "bright

line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir. 2001), the Supreme Court has insisted that "temporal proximity must be 'very close'." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(per curiam). Plaintiff may also show causation indirectly through evidence "such as disparate treatment of fellow employees who engaged in similar conduct." *Rodriguez,* 173 F.Supp.2d at 150 (citing *DeCintio,* 821 F.2d at 115). Alternatively, a plaintiff may establish a causal connection "directly," using "evidence of retaliatory animus directed against plaintiff by the defendant." *Id.*

## 2. Analysis [43]

### a. Muro

■■■ NBC argues that Muro cannot claim that his removal from "Conan" constituted retaliation because he has not shown that he engaged in "protected activity." *See* Def. Muro Mem. at 7. Muro admits that Plonka could not have retaliated against him for making a complaint because he did not complain to her or to anyone else until he was removed from the "Conan" show. *See* Muro Dep. at 153–55. He insists, however, that Plonka retaliated against him for refusing to submit to her sexual advances. *See* Muro 56.1 ¶ 22.

Neither the Second Circuit, nor any other circuit court, has ruled on whether resisting an employer's sexual advances constitutes "protected activity" for purposes of establishing retaliation. *See Fitzgerald*

*v. Henderson,* 251 F.3d 345, 366 (2d Cir. 2001)("[W]e need not rule on the district court's view that 'rejection of sexual advances is not a protected activity under Title VII ...' "); *Murray v. Chicago Transit Auth.,* 252 F.3d 880, 890 (7th Cir. 2001) ("[W]e need not decide whether a plaintiff who rejects a sexual invitation from a supervisor has met the first element of a claim for retaliation because, as discussed above, [Plaintiff] failed to demonstrate that she suffered an adverse employment action ..."); *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 n. 4 (3rd Cir.2000) ("[T]he District Court held that the rejection of a sexual advance was a protected activity, and that determination has not been questioned on appeal. Therefore, we do not need to address it.").

The district courts in this Circuit are split on this issue. *See Rashid v. Beth Israel Med. Ctr.,* No. 96 Civ. 1833, 1998 WL 689931, at *2 (S.D.N.Y. Oct.2, 1998) (Schwartz, J.)(noting district split); *Del Castillo v. Pathmark Stores, Inc.,* 941 F.Supp. 437, 438–39 (S.D.N.Y.1996) (Rakoff, J.)(holding that refusal to submit to sexual advances does not constitute protected activity because "[i]f it were otherwise, every harassment claim would automatically state a retaliation claim as well."); *Burrell v. City Univ. of New York,* 894 F.Supp. 750, 761 (S.D.N.Y.1995) (Sweet, J.) (holding that refusal to submit to sexual advances constitutes protected activity).

The majority of courts in other districts have held that an employee's refusal to submit to sexual advances constitutes "protected activity". *See Black v. City & County of Honolulu,* 112 F.Supp.2d 1041, 1048 (D.Hi.2000) (collecting cases); *see also Fleming v. South Carolina Dept. of Corrections,* 952 F.Supp. 283, 288

---

**43.** Hogan has not asserted a retaliation claim.

(D.S.C.1996)(refusal of sexual advances constitutes "protected activity"); *Farrell v. Planters Lifesavers Co.*, 22 F.Supp.2d 372, 392 (D.N.J.1998), *aff'd in part, reversed in part on other grounds*, 206 F.3d 271 (3rd Cir.2000); *Armbruster v. Epstein*, No. Civ. A. 96–CV–1059, 1996 WL 289991, at *3 (E.D.Pa. May 31, 1996)(same); *Boyd v. James S. Hayes Living Health Care Agency, Inc.*, 671 F.Supp. 1155, 1167 (W.D.Tenn.1987)(same); *EEOC v. Domino's Pizza*, 909 F.Supp. 1529, 1533 (M.D.Fla.1995)(same); *but see Fitzgerald v. Henderson*, 36 F.Supp.2d 490, 499 (N.D.N.Y.1998), *aff'd in part, reversed in part on other grounds*, 251 F.3d 345 (2d Cir.2001); *Speer v. Rand*, No. 95 C 6265, 1996 WL 667810, at *8 n. 4 (N.D.Ill. Nov.15, 1996), *aff'd on other grounds*, 123 F.3d 658 (7th Cir.1997).[44]

■ I conclude that rejecting sexual advances from an employer does constitute "protected activity". The prohibition against retaliation is intended to protect employees who resist unlawful workplace discrimination. *See Pimentel*, 2001 WL 1579553, at *16. Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct. *See Black*, 112 F.Supp.2d at 1049; *Fleming*, 952 F.Supp. at 288. Accordingly, Muro has stated a valid claim for retalia-

tion with respect to his removal from the "Conan" show.

Muro has not, however, produced sufficient evidence to defeat summary judgment on his claim that his removal from "Rosie" constituted unlawful retaliation. Muro insists that Miller's decision to remove him from the show was influenced by Plonka's warning of his incompetence. But he has not produced any evidence that Miller knew that Muro had refused to submit to Plonka's sexual advances, that he had recently filed a complaint with NBC's Ombudsperson, or that he engaged in any other protected activity. Therefore, Muro cannot demonstrate a causal connection between his removal from "Rosie" and his statutorily protected activity.

■ Muro's claim that his subsequent assignment to weekend and overnight shift work constituted discriminatory retaliation withstands summary judgment. Muro engaged in "protected activity" when he filed a complaint with the NBC Ombudsperson in June 1998. His assignment two months later to undesirable shifts on "The Sunrise Show" and then on "Weekend Today" raises a genuine issue of fact as to whether Muro's protected activity was "followed [so] closely by discriminatory treatment" as to establish causation by temporal proximity.[45] *Rodriguez*, 173 F.Supp.2d at 150. Moreover, Muro's testimony that Accarrino ignored his earlier complaints and con-

---

**44.** In *Holtz v. Marcus Theatres Corp.*, 31 F.Supp.2d 1139 (E.D.Wis.1999), the court did not directly address the issue but suggested that a claim of "retaliation for refusing to submit to the sexual advances of a supervisor" is more aptly characterized as claim for quid pro quo sexual harassment. *Id.* at 1148 n. 8.

**45.** These assignments were too temporally remote from the 1997 Baptiste meeting to establish causation by temporal proximity. *See Clark County Sch. Dist.*, 532 U.S. at 273–74, 121 S.Ct. 1508 (citing approvingly cases dis-

missing retaliation claims where there were three and four month periods between protected activity and adverse employment action); *Cooper v. Morgenthau*, No. 99 Civ. 11946, 2001 WL 868003, at *8 (S.D.N.Y. July 31, 2001)(dismissing retaliation claim where alleged adverse employment action occurred seven months after protected activity); *Cobian v. New York City*, No. 99 Civ. 10533, 2000 WL 1782744, at *16 (S.D.N.Y. Dec.6, 2000)(dismissing retaliation claim where there was four month lapse between protected activity and adverse employment action).

tinued to mock and intentionally mispronounce his name until he filed his EEOC complaint suggests the type of "retaliatory animus" that may establish causation. *See id.*

####### b. Little

■ Little's claim that NBC retaliated against him after he filed a charge with the NYSDHR by initiating an investigation into his employment fails as a matter of law. While the filing of the Charge constitutes protected activity, *see Kotcher,* 957 F.2d at 65, the investigation alone does not constitute an adverse employment action, *see Economou v. Caldera,* No. 99 Civ. 12117, 2000 WL 1844773, at *21 (S.D.N.Y. Dec.18, 2000). Because Little has not produced evidence that any "disciplinary or other type of action was ever taken against [him] as a result of the investigation," he cannot establish a prima facie case of retaliation. *Garcia v. West,* No. 98 Civ. 3905, 1999 WL 782563, at *4 (S.D.N.Y. Sept.30, 1999).

####### c. Rivera

■ Rivera alleges that NBC retaliated against him for refusing to participate in Scott's allegedly racist "agenda" and for his May 1996 testimony in support of co-worker Giles' complaints regarding Scott. The alleged retaliation by Scott includes: Scott's false accusations of drug abuse, order to take medical leave, and threats of termination; his "physically menacing" behavior in 1996; Scott's involvement in Rivera's removal from an Olympics assignment in 1996; his threatening responses to Rivera at a June 1997 Meeting regarding his assignment to "Conan"; and Scott's issuance of a Final Letter of Warning and docking Rivera's pay in February 1998.[46]

NBC claims that Rivera's hostile work environment claim must be dismissed because Rivera cannot establish: (1) that decision-makers at NBC knew of the protected activity when they engaged in the allegedly retaliatory action, and (2) a causal connection between the retaliatory action and the protected activity. *See also* Def.'s Rivera Mem. at 8–9; Def. Repl. Mem. at 12. Rivera provides no evidence that Scott and/or NBC knew of his 1996 testimony prior to the parties' 1999 arbitration proceedings, where the testimony was discussed. *See* Rivera Aff. ¶ 10. Because all of the allegations of retaliation took place prior to those discussions, Rivera cannot sustain a claim of retaliation based on his 1996 testimony.

■ To the extent that Rivera's retaliation claim is based on his refusal to engage in Scott's racist "agenda", however, Rivera has produced sufficient evidence to defeat summary judgment. *First,* Rivera's refusal to participate in Scott's discriminatory activity may constitute protected activity because it is a means of opposing such unlawful conduct. *See Black,* 112 F.Supp.2d at 1049; *Fleming,* 952 F.Supp. at 288. *Second,* Rivera has produced evidence that Scott was aware of his refusal. *Third,* many of Scott's allegedly retaliatory actions (*e.g.,* physical intimidation, unwarranted disciplinary letters) could constitute an adverse employment action. Finally, evidence that Scott made inappropriate and insulting comments about minorities and that he was intentionally tougher on minorities, if true, may suggest the type of "retaliatory animus" that can establish causation. *Rodriguez,* 173 F.Supp.2d at 150. Accordingly,

46. Because I have refused to dismiss Rivera's time-barred retaliation claims on statute of limitations grounds, I will consider those time-barred allegations when assessing his prima facie case of retaliation.

summary judgment is denied with respect to this claim.

### d. Perez

Perez claims that she was retaliated against after: (1) she met with the NBC Ombudsperson in March 1995, and (2) she complained about her co-workers' harassing behavior to her supervisors. *See* Def. Perez Mem. at 8. As noted earlier, any retaliatory acts perpetrated before May 12, 1997 are time-barred. Therefore, any timely allegations of retaliation would have occurred over two years after the March 1995 meeting and would be "too attenuated" to establish the causal connection required for a claim of retaliation. *Gorman–Bakos*, 252 F.3d at 554; *see also Clark County Sch. Dist.*, 532 U.S. at 273, 121 S.Ct. 1508 (holding that in order to establish a causal connection between a protected activity and retaliatory acts, the "temporal proximity" between them must be "very close"). With respect to the alleged retaliation by her co-workers, Perez cannot maintain her claim because she has produced no evidence that her co-workers knew about her "protected activity." Perez testified at her deposition that she complained to her supervisors, but she has presented no evidence that her supervisors ever discussed her complaints with her co-workers. Perez stated: "My co-workers know that I don't get support from NBC management after I complain about sexual harassment and they're free to continue [that sexual harassment]." Perez Dep. at 647. This single conclusory statement, which is "devoid of any specifics", cannot establish that her co-workers actually knew about her complaints to management. *Bickerstaff*, 196 F.3d at 452. Thus, Perez cannot establish that her co-workers were aware of any protected activity or that their actions were causally related to this protected activity and her retaliation claim must be dismissed.

### F. Hostile Work Environment Claims

#### 1. Legal Standard

To establish a claim of hostile work environment, a plaintiff must show that: (1) he or she was subjected to harassment because of his or her membership in a protected class that was so severe or pervasive as to alter the conditions of his or her employment; and (2) there is a specific basis for imputing the harassment to the defendant. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995); *O'Dell v. Trans World Enter. Corp.*, 153 F.Supp.2d 378 (S.D.N.Y.2001). The test for the first prong is whether the employment environment was "objectively hostile"—that is, whether the environment "was permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *O'Dell*, 153 F.Supp.2d at 385 (internal quotation marks and citations omitted). The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a "general civility code." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998. Courts "must distinguish between 'merely offensive and boorish conduct' and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *O'Dell*, 153 F.Supp.2d at 386 (quoting *Cruz*, 202 F.3d at 571).

In determining whether a workplace is objectively hostile, a court should look at the "totality of the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In particular, courts should examine "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997). "[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Quinn,* 159 F.3d at 768.

Various types of acts, depending on their severity or pervasiveness, can create a hostile work environment. Courts have found that a series of racist comments directed at an employee can create a hostile work environment. *See Schwapp,* 118 F.3d at 112. Similarly, vulgar comments and gestures directed at employees can be sufficiently offensive, pervasive and continuous to constitute a sexually hostile work environment. *See Kotcher,* 957 F.2d at 61, 63. Offensive displays can also create a hostile work environment. For example, courts have found sexual harassment based on a hostile work environment where employees were subjected to "the display of obscene visual representations or the communication of sexually offensive remarks." *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 411 (S.D.N.Y.1996). Similarly, the posting of Ku Klux Klan literature and the use of racial epithets, without more, may create a hostile work environment if sufficiently continuous and pervasive. *See Snell,* 782 F.2d at 1103.

Racial or sexual epithets need not be directed at an employee to contribute to a hostile work environment, because "evidence of harassment of [other members of the protected group], if part of a pervasive or continuing pattern of conduct, [is] surely relevant to show the existence of a hostile work environment." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997). Moreover, remarks or behavior directed at individuals who are not members of the plaintiff's protected class may be considered when considering the pervasiveness and severity of workplace harassment. *See Cruz,* 202 F.3d at 570 ("Remarks targeting members of other minorities ... may contribute to the overall hostility of the working environment for a minority employee."). However, some courts have refused to permit a plaintiff to assert discrimination claims based solely on conduct directed at a protected class of employees to which the plaintiff did not belong. *See Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 186 (2d Cir.2001)(citing cases but refusing to decide the issue); *Bermudez v. TRC Holdings, Inc.,* 138 F.3d 1176, 1180 (7th Cir.1998) (holding that white female employee could not allege injury on behalf of black applicants to employment agency who were discriminated against because of race); *Childress v. City of Richmond,* 134 F.3d 1205, 1209 (4th Cir. 1998) (en banc) (Luttig, J., concurring) ("[B]ecause the white male plaintiffs in the present case assert only the rights of third-parties to be free from race or sex-based discrimination in the workplace, they have not stated a cause of action under Title VII."); *Patee v. Pacific Northwest Bell Tel.,* 803 F.2d 476, 478 (9th Cir.1986) ("The male workers do not claim that they have been discriminated against because they are men .... [T]he male workers cannot assert the right of their female co-workers to be free from discrimination based on their sex.").

### 2. Analysis [47]

#### a. Muro

▮ NBC argues that Muro has failed to produce sufficient evidence to support his claim of a racially hostile work environment.[48] The evidence establishes three timely allegations of racially offensive comments or incidents of racial harassment: (1) in 1998 and 1999 McCourt used a "weird Spanish accent" when talking to Hispanic people and, when filming an outdoor concert, Muro overheard McCourt say "it's going to be greasy out there. There is going to be lots of beans and rice and chicken all over the street. Those people are very greasy;" (2) in June 2000, Muro saw Klu Klux Klan robes outside the door to the "Conan" control room; and (3) in June 2001, Muro saw a noose hanging inside NBC with an African–American co-worker's name attached to the rope. These incidents are different in kind and occurred in different locations; there is no evidence that they are attributable to the same offender. Nonetheless, when viewed collectively, they could establish that Muro's work environment was "permeated" by racial hostility that was so "severe or pervasive" as to "alter the conditions of [his] employment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000).

McCourt's comments, standing alone, were not so severe that they could alter the conditions of Muro's employment. *See, e.g., Carrasco v. Lenox Hill Hosp.*, No. 99 Civ. 927, 2000 WL 520640, at *6 (S.D.N.Y., Apr.28, 2000). However, when combined with the display of Klu Klux Klan robes and/or the noose, these incidents may constitute an objectively hostile environment. Like the swastika, "the Klansman's hood [and] the noose ... [are] intended to arouse fear." *Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1583 (11th Cir.1993) (Fay, J. dissenting). They are symbols of this nation's legacy of violence against African–Americans,[49] as well as other disfavored groups, and bring with them "the grim specter of racially motivated violence" that continues today. *Williams v. City of New York Hous. Auth.*, 154 F.Supp.2d 820, 824 (S.D.N.Y.

**47.** As noted earlier, Rivera's and Hogan's hostile work environment claims are dismissed for failure to exhaust administrative remedies. Even if Hogan's claims were not dismissed on those grounds, however, her allegations regarding the "The Today Show" could not support a sexual harassment claim because they were not severe or pervasive enough to alter the conditions of her employment. Assuming Hogan's allegations to be true, the behavior of the male crew members is admittedly offensive but it does not permeate "The Today Show" environment with discriminatory intimidation, ridicule or insult. *See Cruz,* 202 F.3d at 570. While the offensive behavior of the male crew members is purportedly continuous, *see* Hogan Aff. ¶ 12, it is not physically threatening or humiliating. Furthermore, Hogan has not presented any evidence that the crew's behavior toward her negatively affect her work performance. Most important, Hogan has failed to establish that she is being subjected to this harassment because of her membership in a protected class. *See Oncale*, 523 U.S. at 82, 118 S.Ct. 998 ("[I]n every sexual harassment case, the plaintiff must plead and ultimately prove Title VII's statutory requirement that there be discrimination 'because of ... sex'") (Thomas, J., concurring). For these reasons, all claims of sexual and national origin harassment, including claims of hostile work environment, would be dismissed.

**48.** NBC has not argued that Muro's claim that Plonka created a sexually hostile work environment should be dismissed on summary judgment. *See* Def. Muro Mem. at 8–9.

**49.** *See, e.g.,* Mark Curriden & Leroy Phillips, Jr., *Contempt of Court: The Turn–of–the–Century Lynching that Launched a Hundred Years of Federalism* (1999) (reporting that between 1882 and 1944, 3,417 of the 4,708 lynching victims in the United States were African–American).

2001). Indeed, the noose may be "among the most repugnant of all racist symbols, because it is *itself* an instrument of violence." *Id.* at 825 (emphasis added). Accordingly, the robes and/or the noose may constitute the type of "intimidating conduct" that would support Muro's hostile work environment claim. *Id.* at 826 (holding that employee had valid hostile work environment claim where complaint alleged that supervisor displayed a noose in plaintiff's office for three days); *see also Snell,* 782 F.2d at 1098, 1103 (holding that plaintiffs could establish hostile work environment where co-workers posted racially offensive materials, including Klu Klux Klan literature and a picture of a black man with a noose around his neck). Collectively, there is sufficient evidence here to permit this claim to be heard by a jury.

### b. Little

 Little has produced sufficient evidence of a racially hostile work environment to survive NBC's motion for summary judgment. Little alleges the following timely incidents of racial harassment: (1) harsh treatment of African–American employees, including an incident in which he was allegedly removed from NBC premises due to his race; (2) vulgar comments made about or directed at female employees at NBC; (3) Scott's instructing him to monitor Italian co-workers; (4) his sighting of a Ku Klux Klan robe hanging on a wardrobe rack in an exterior hallway on June 21, 2000; and (5) his June, 2001 sighting of a noose hanging inside NBC with the name of an African–American co-worker attached to it. As noted above, the Klu Klux Klan robes and/or the noose may constitute

the type of "intimidating conduct" that would support a hostile work environment claim. *Williams,* 154 F.Supp.2d at 826. This is particularly true here, where plaintiff is an African–American, because "[t]he hangman's noose remains a potent and threatening symbol for" that group. *Id.* The potential impact of the robes and the noose is also heightened in this case because Little has produced evidence that these incidents occurred in an environment permeated with racial animus, where he and other employees were treated harshly because of their race. Finally, the alleged harassment of females and Italians may have "contribute[d] to the overall hostility of [Little's] working environment." *Cruz,* 202 F.3d at 570. Examining the totality of the circumstances, I conclude that Little has raised a genuine issue of material fact as to whether the hostility in his work environment was so severe or pervasive as to alter the conditions of his employment.

### c. Perez

 Perez has produced sufficient evidence to establish a number of timely allegations of sexually offensive acts or comments on the set of "Conan".[50] These include: Hartmann's physically menacing conduct; two instances where Perez was subjected to the playback of a sexually charged audio tape; a number of instances where massages were exchanged between male and female co-workers; the display of sexually charged materials on the set; and Hartmann's continuously hostile and uncooperative manner. Contrary to NBC's contention, these incidents, if proven, were sufficiently severe or pervasive to constitute sexual harassment. *See Harris,*

---

**50.** As stated earlier, Perez's race harassment claim is dismissed because she failed to exhaust her administrative remedies.

510 U.S. at 23, 114 S.Ct. 367 (stating that a court may look to whether harasser's behavior was physically threatening or humiliating in order to determine if a hostile environment existed); *Iannone,* 941 F.Supp. at 411 (finding sexual harassment where employee was subject to the "display of obscene visual representations" and "communication of sexually offensive remarks"). NBC insists that Hartmann's behavior is attributable to a personality conflict between Perez and Hartmann and that Perez has failed to proffer evidence that Hartmann's alleged harassment occurred "because of" her sex. *See* Def. Perez Mem. at 10. However, a trier of fact could infer that his behavior was motivated by her sex from evidence that he commented, on a number of occasions, that "it smelled like fish" in Perez's presence and that he would only respond to Perez's instructions if relayed through a male colleague. Accordingly, summary judgment is denied with respect to this allegation.

### G. NBC's Vicarious Liability

NBC argues that, even if plaintiffs establish the elements of a hostile work environment, it cannot be held liable for the conduct of plaintiffs' supervisors and co-workers. *See* Def. Mem. at 22.

#### 1. Legal Standard

■ For an employer to be held liable for the conduct of its employees a plaintiff must demonstrate a basis for liability. *See O'Dell,* 153 F.Supp.2d at 387 (sexual discrimination) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Pimentel,* 2001 WL 1579553, at *8 n. 7 (racial discrimination). When the perpetrator is the plaintiff's supervisor, there is a presumption that the employer is liable. *See Fitzgerald v. Henderson,* 251 F.3d 345, 357 (2d Cir.2001). If the plaintiff establishes a

claim of quid pro quo sexual harassment— that is, plaintiff's refusal to submit to the supervisor's sexual demands resulted in a "tangible employment action"—the employer will be held strictly liable. *O'Dell,* 153 F.Supp.2d at 387–88 (citing *Ellerth,* 524 U.S. at 760–61, 118 S.Ct. 2257); *see also Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (defining a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Where the supervisor took no tangible employment action against the plaintiff, an employer's vicarious liability is subject to a two-part affirmative defense commonly know as the *"Faragher/Ellerth* defense." *O'Dell,* 153 F.Supp.2d at 388. This defense allows an employer to escape liability for the conduct of the supervisor if the employer demonstrates that: (1) it took reasonable steps to prevent harassment and to remedy such conduct promptly once it was brought to the employer's attention; and (2) the harassed employee unreasonably failed to avail himself or herself of any corrective or preventive opportunities made available by the employer. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *O'Dell,* 153 F.Supp.2d at 388.

■ When harassment is attributable to plaintiff's co-worker, the employer will be held liable only for its own negligence. *See Carrasco,* 2000 WL 520640, at *7. The predicate negligence is established if plaintiff can show that either: (1) the employer provided no reasonable avenue for complaint; or (2) the employer knew or should have known about the harassment and failed to intervene. *See id.* at *10. Thus, an employer will not be liable if it provided a means for addressing com-

plaints or, in the absence of a formal system, neither knew nor should have known that a co-worker harassed the plaintiff.[51]

### 2. Analysis

#### a. Liability for Supervisor Conduct

 Assuming, arguendo, that plaintiffs cannot establish quid pro quo harassment and the *Faragher/Ellerth* defense is therefore available to NBC, plaintiffs have produced sufficient evidence to defeat summary judgment on this ground. NBC argues that it meets the first prong of the defense because it is undisputed that NBC had an anti-harassment policy that contained a comprehensive complaint procedure, that this policy was distributed and posted, that plaintiffs saw the policy, and that NBC mandated diversity and harassment prevention training which plaintiffs attended. *See* Def. Mem. at 23. While the existence of an anti-harassment policy with complaint procedures is strong evidence that an employer has met the first prong of the *Faragher/Ellerth* defense, it is not dispositive. *See O'Dell*, 153 F.Supp.2d at 388. Plaintiff may rebut this evidence with proof that the policy was ineffective. *See id.* (citing *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *Franklin v. Consolidated Edison Co. of New York, Inc.*, No. 98 Civ. 2286, 1999 WL 796170, at *8 (S.D.N.Y. Sept.30, 1999)). Here, plaintiffs have raised a genuine issue of fact as to whether NBC's policy was "effective." NBC responded to plaintiffs' formal complaints by meeting with them and promising to conduct an investigation. However, there is evidence that plaintiffs' supervisors routinely dismissed or mocked their informal complaints, *see, e.g.*, Perez Dep. at 249, 666,

725; Perez Aff. ¶ 8, that the NBC Ombudsperson told Muro that "she was there to defend NBC" and that her "responsibility [was] to NBC," Muro 56.1 ¶ 39, that the Ombudsperson refused to honor Perez's requests for secrecy, *see* Perez Dep. at 663; and that NBC took no action in response to plaintiffs' complaints, *see, e.g.*, Rivera Dep. at 374; Perez 56.1 32. This evidence suggests that the company policy may not be "effective." Therefore, there are disputed issues of material fact with regard to NBC's vicarious liability for supervisor harassment.

#### b. Liability for Co–Worker Harassment Against Perez

 NBC claims that it should not be held liable for the actions of Perez's co-workers because NBC has a sexual harassment policy that Perez was aware of and it neither knew nor should have known of the harassment. This claim fails for two reasons. *First*, Perez registered complaints regarding many of the alleged instances of harassment with various supervisors, both orally and by email. *See, e.g.*, Perez Dep. at 131–32, 147, 249–51, 647, 655, 723, 740–41, 751–55. *Second*, she has proffered evidence that some of the incidents of harassment, such as the display of sexually charged materials, were witnessed by her supervisors and that her supervisors participated in some of the harassment. *See* Perez Dep. at 630–35; Perez Aff. ¶ 17; Plonka Dep. at 104, 133, 165. Because a material issue of fact exists as to whether NBC knew or should have known about the harassing behavior of Perez's co-workers, the issue of NBC's liability for co-worker harassment cannot be resolved on summary judgment.

---

**51.** The *Faragher/Ellerth* defense is not available when plaintiff claims harassment by a co-worker rather than a supervisor. *See Richardson*, 180 F.3d at 440.

## VI. CONCLUSION

For the reasons stated above, the following claims are dismissed:

### A. Muro

1. All Title VII claims arising prior to October 25, 1997;

2. All NYSHRL claims arising prior to August 3, 1997;

3. Race and/or sex discrimination claims based on (a) his experience on "Conan", (b) his removal from "Conan", and/or (c) Miller's request that he be removed from "Rosie";

4. Retaliation claim based on his removal from "Rosie";

5. Racially hostile work environment claim.

### B. Hogan

1. All Title VII claims arising prior to January 2, 1999;

2. All NYSHRL claims arising prior to August 3, 1997;

3. Hostile work environment/harassment claim.

### C. Little

1. All Title VII claims arising prior to July 12, 1997;

2. All NYSHRL claims arising prior to May 12, 1997;

3. Race discrimination claim based on NBC's denial of (a) his request to work as an AVID editor, (b) his request for a Group 7 position in the Videotape Operations department, (c) his request to work with the Olympics, and/or (d) his repeated requests for a work schedule that would accommodate his child custody obligations;

4. Retaliation claim.

### D. Rivera

1. Title VII claims arising prior to June 21, 1997, *except* allegations of retaliation;

2. NYSHRL claims arising prior to May 12, 1997, *except* allegations of retaliation;

3. Retaliation claim based on responses to his 1996 testimony before the NYSHRL;

4. Race discrimination claim;

5. Racial harassment claim.

### E. Perez

1. Title VII claims arising prior to October 25, 1997, *except* hostile work environment allegations regarding Hartman;

2. NYSHRL claims arising prior to May 12, 1997, *except* hostile work environment allegations regarding Hartman;

3. Racial harassment claim;

4. Retaliation claim;

5. Discrimination claim based on (a) NBC's refusal to give her "high profile" assignments, (b) NBC's denial of her requests for training, and/or (c) Accarino's failure to award her a PSC.

To the extent that they are not time-barred, the following claims remain for trial:

### A. Muro

1. Hostile work environment/sexual harassment claim;

2. Race discrimination claim based on his assignment to weekend and late night shifts after his removal from "Rosie";

3 Retaliation claim based on (a) his removal from "Conan", and/or (b) his assignment to weekend and over-

night shifts after his removal from "Rosie".

**B. Hogan**

1. Race and sex discrimination claims.

**C. Little**

1. Race discrimination claim based on (a) his reduction in supervisory ARPS assignments while under Scott's supervision, and/or (b) his exclusion from Graceland training in 1999;

2. Racially hostile work environment claim.

**D. Rivera**

1. Retaliation claim based on his refusal to engage in Scott's allegedly racist "agenda", *including* any allegedly time-barred allegations of retaliation.

**E. Perez**

1. Sexual harassment claim, *including* any allegedly time-barred hostile work environment allegations regarding Hartman;

2. Discrimination claim based on denial of a permanent upgrade.

Now that the consolidated pre-trial proceedings are concluded, the Clerk of the Court is directed to reassign the following cases:

*Perez v. NBC,* 00 Civ. 3612

*Rivera v. NBC,* 00 Civ. 3616

*Hogan v. NBC,* 00 Civ. 5771

*Muro v. NBC,* 00 Civ. 5774

In *Little v. NBC,* 00 Civ. 3606(SAS), a status conference will be held on May 1, 2002, at 4:30 p.m.

SO ORDERED: